Lee **RAKESTRAW**, et al., Plaintiffs,

v.

**UNITED AIRLINES, INC., and Air Line Pilots Association, International, Defendants.**

No. 91 C 2325.

United States District Court, N.D. Illinois, E.D.

May 30, 1991.

Thomas R. Meites, Michael M. Mulder, Paul W. Mollica, Laurie A. Wardell, Meites, Frackman, Mulder & Burger, Chicago, Ill., for plaintiffs.

Robert A. Siegel, O'Melveny & Myers, Los Angeles, Cal., Duane M. Kelley, Robert W. Tarun, Winston & Strawn, Chicago, Ill., for defendant United Airlines, Inc.

Michael E. Abram, Stephen Presser, Peter Herman, Cohen, Weiss and Simon, New York City, Michael B. Erp, Katz, Friedman, Schur & Eagle, Chtd., Chicago, Ill., for defendant Air Line Pilots Ass'n.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

The issues presented in this action arise from a twenty-nine day strike in 1985 by defendant Air Line Pilots Association, International ("ALPA" or "the union") against defendant United Airlines, Inc. ("United"). Plaintiffs are 103 pilots who were hired by United to replace striking pilots. Plaintiffs seek to enjoin United and ALPA from implementing a provision of a new collective bargaining agreement that adversely affects plaintiffs' seniority rights. Plaintiffs allege that in negotiating the seniority provision of the new collective bargaining agreement, United and ALPA breached various sections of the Railway Labor Act ("the RLA"), 45 U.S.C. §§ 151–188. Plaintiffs also bring state law claims for breach of contract and tortious interference with contract against United and ALPA, respectively.

Pursuant to Fed.R.Civ.P. 65(a)(2), the parties stipulated to the consolidation of the preliminary injunction hearing with a trial on the merits.[1] The case was tried before the court on May 20, 1991. After hearing the testimony of the witnesses, considering the arguments of counsel and reviewing the trial exhibits, including affidavits and deposition transcripts, the court enters the following findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

The facts surrounding the 1985 ALPA strike against United are set forth in great detail in *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc. ("ALPA v. United Air Lines")*, 614 F.Supp. 1020, *modified*, 616 F.Supp. 849 (N.D.Ill.1985) (Bua, J.), *aff'd in part and rev'd in part*, 802 F.2d 886 (7th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). Because the parties have adopted most or all of Judge Bua's factual findings, the court's factual findings shall refer to Judge Bua's opinion where appropriate.

I. The Parties

■ 1. United is a Delaware corporation with its principal place of business in Elk Grove, Illinois. Stipulation of Uncontested Facts ("Stipulation") ¶ 2. United operates a commercial passenger airline system serving several hundred domestic and international destinations. Thus, United is a "carrier" as defined by the RLA, 45

---

1. The stipulation is conditioned upon plaintiffs' retaining their right to seek damages in the event the new seniority provision is implemented and later found to be invalid. Plaintiffs also reserved the right to present additional evidence and to seek damages on the claim that United improperly held back captains' bids from plaintiffs.

U.S.C. § 181, and is subject to the RLA's provisions. *Id.*

2. ALPA is the certified collective bargaining representative under the RLA for all pilots employed by United. Under ALPA's constitution and bylaws, ALPA may make policy decisions and enter into collective bargaining agreements only through the actions of the United–ALPA Master Executive Council ("the MEC"). The MEC is composed of representatives elected from each of United's pilot domiciles. Stipulation ¶ 3.

3. Plaintiffs are 103 "fleet qualified" United pilots who were hired as replacement pilots beginning May 17, 1985, the first day of ALPA's strike against United. Plaintiffs are deemed "fleet qualified" because at the time United offered plaintiffs employment, plaintiffs were already qualified under FAA regulations to operate United's aircraft as either captains or first officers. Each plaintiff was hired pursuant to an individual employment agreement with United. *Id.* ¶ 4.

## II. Events Leading to the 1985 Strike

### A. *The Group of 570*

4. In early 1984, United and ALPA commenced negotiations for a new collective bargaining agreement to replace the existing agreement, which was set to expire on April 1, 1984. *Id.* ¶ 5.

5. At the time United and ALPA began their negotiations, United had not hired pilots since the period between 1977 and 1979. Krop Aff. ¶ 3. During the 1984 negotiations, however, United foresaw the need for additional pilots. *Id.* Thus, beginning in the fall of 1984, United selected approximately 570 individuals ("the 570") to participate in a pilot training program. Stipulation ¶ 6.

6. Although United needed new pilots, it did not want to hire the 570 until after the completion of negotiations, because United hoped to take advantage of proposed lower wages for new employees. Krop Aff. ¶ 5. As a result, United established a new type of training program for the 570. The training program was intended to create a pool of trained pilot candidates for employment with United, if needed, within twelve months of graduation. *See* United Ex. 538. In exchange for advance training from United, each of the 570 signed a flight officer training agreement acknowledging that trainees were not United employees and would receive no compensation except $30 a day for expenses. *Id.;* Stipulation ¶ 7. The agreement also acknowledged that United could terminate the training without notice or liability. United Ex. 538.

7. Prior to 1984, United's practice had been to offer employment to trainees as "student pilots" at the time they began training. On or about the first day of training, the student pilots were placed on the United payroll and were assigned a pilot seniority date and a corresponding tentative seniority number. The student pilots received a final seniority number after completing training and a short period of FAA-supervised flying. Krop Aff. ¶ 4; Smith Decl. ¶ 6.

8. Thus, the training program for the 570 differed from past training programs in terms of salary and formal offers of employment. However, in terms of seniority, the 570 were treated like past student pilots; they received conditional seniority numbers based on their initial day of training. Smith Decl. ¶ 10; Krop Aff. ¶ 6.

9. On April 15, 1985, the National Mediation Board ("the NMB") notified ALPA and United that the collective bargaining negotiations had reached an impasse and that its mediation efforts had failed. Pursuant to the RLA, the NMB proffered arbitration. Arbitration was not accepted. On April 16, 1985, the NMB released United and ALPA from mediation, permitting both ALPA and United to engage in lawful self-help under the RLA after a mandatory 30–day cooling off period expiring on May 17, 1985. Stipulation ¶ 8; 45 U.S.C. § 156.

10. After the release, United formally offered the 570 employment beginning May 17, 1985, the scheduled date for commencement of the ALPA strike. The original offers were not conditioned on the 570 reporting to work on May 17. Stipulation

¶ 9; United Ex. 522. However, as the strike date drew near, United informed the 570 that they would not be employed as United pilots unless they reported to work on May 17. Stipulation ¶ 9.

11. Meanwhile, ALPA urged the 570 to respect ALPA's picket lines and promised the 570 that ALPA would do everything it could to protect their employment rights at United. Smith Decl. ¶ 12.

### B. *Fleet Qualified Pilots (Plaintiffs)*

12. United did not rely solely on the 570 to cross picket lines in the event of a strike. Prior to the strike, United also recruited fleet qualified pilots to work as permanent replacements for striking pilots beginning May 17, 1985. Stipulation ¶ 11. United solicited permanent replacements by advertising in various publications across the country. The advertisements stated, *inter alia,* that:

Flight Crew positions may become available should a threatened strike by our Pilots occur. In such event, those employed will be permanent replacements for striking Pilots.

Captains will be paid $75,000 per year, and First Officers will be paid $50,000 per year.

United Ex. 519; Pl.Ex. 9.

13. The advertisement invited qualified pilots to call a 900 number to receive additional information and to arrange an immediate interview. *Id.* The recorded message briefly explained United's position regarding the breakdown in collective bargaining negotiations. *See* United Ex. 520; Pl.Ex. 10. The message reiterated United's intention of hiring fleet qualified pilots to permanently replace striking pilots in captain and first officer positions at salaries of $75,000 and $50,000, respectively. The message assured candidates that "as a permanent replacement your employment as a Flight Officer will be secure regardless of any eventual settlement with ALPA." *Id.* The message stated that after the strike, replacement pilots would retain their salaries, but would not necessarily keep their positions as captains and first officers:

Post strike operations will require you to bid for a vacancy which shall be assigned on the basis of your hiring date seniority. However, your salary plus any general increases would remain in effect until your seniority allows you to move up in status or equipment in a higher pay bracket under the new hire pay scale. We would not decrease your salary even if a settlement is reached and even if your responsibilities are changed.

*Id.* The guaranteed salary was a powerful inducement, because the salary offer of $75,000 or $50,000 was significantly higher than the salary other United pilots received for the same positions under the ALPA–United collective bargaining agreement. *ALPA v. United Air Lines,* 614 F.Supp. at 1047; Transcript of May 20, 1991 Hearing ("Hearing Tr.") at 49.

14. Candidates who applied to United for employment as fleet qualified pilots and who appeared to meet the job criteria were asked to interview and undergo various examinations and employment processing at United's offices. Stipulation ¶ 13. During these interview sessions, the fleet qualified pilots were told that if hired, their pilot seniority date would be the date they commenced training (*i.e.* their hiring date), and that following the strike their seniority rights would be governed under the United–ALPA collective bargaining agreement. Krop Aff. ¶ 15. This meant that the permanent replacement pilots would be placed behind returning strikers on the seniority list. *Id.*

15. A United pilot's seniority number measures his or her relative seniority position on the United pilot system seniority list for purposes of seniority-based competitive bidding for pilot vacancies, monthly flight schedules and vacations under the pilot collective bargaining agreement. Pilots with a lower seniority number may outbid other pilots with higher seniority numbers for a variety of employment benefits including: (1) higher-paying pilot positions on better aircraft, (2) more desirable monthly flight schedules, (3) more desirable vacation dates, and (4) more desirable bases of operations. Stipulation ¶¶ 26–29.

16. Plaintiff Richard Lussow testified that he interviewed for a position as a permanent replacement pilot at United's offices on May 15 and 16, 1985. Hearing Tr. at 11. During a second interview on May 16, Lussow met with a United personnel officer and an individual from flight management in order to clarify the terms of United's employment offer. *Id.* at 11–12. Lussow was told that if he received an offer of employment, he would be offered the position of captain at an annual salary of $75,000. Lussow Dep. at 51. United personnel officers explained to Lussow that his seniority would begin to accrue on his first day of employment. Hearing Tr. at 12. Lussow was also told that if the 570 pre-hires failed to report to work on May 17, 1985, they would not be employees and therefore would not have any seniority. Hearing Tr. at 12. United personnel also stated that only a very small number of the 570 were expected to report to work on May 17. Lussow Dep. at 53; Hearing Tr. at 22. This was important to Lussow, because Lussow knew that if the 570 did report for work, they would be considered United employees with seniority rankings ahead of Lussow and other replacement pilots. Lussow Dep. at 55, 58; Hearing Tr. at 22.

17. Following this interviewing process, United offered employment to some candidates. Stipulation ¶ 13. These candidates received a full or conditional offer in writing from United. *See* Pl.Ex. 6; United Ex. 523. These written offers were form letters explaining to each pilot the terms of employment and where to report to work.

18. United's Exhibit 523 is an example of United's written offer of employment to fleet qualified pilots.[2] This particular offer was made to plaintiff George Spillman and dated May 16, 1985. The letter offers Spillman a captain's position at a salary of $75,000 a year, beginning May 17, 1985.

The offer was conditioned upon an ALPA strike; in the event a strike did not occur, the offer was invalid. In terms of promised job security, the offer stated:

> If your effective date of employment is after May 17 and should a settlement be reached with our Pilots' Union prior to your starting work, United will continue to honor its job offer commitment to you.... Your salary plus any general increases would remain in effect until your seniority allows you to move up in status or equipment in a higher pay bracket under the new hire pay scale. Your salary will not be decreased even if a settlement is reached and even if your responsibilities are changed.

*Id.* The offer stressed that United management would fully support fleet qualified pilots should they encounter any difficulties during their employment. In closing, United's offer stated:

> Richard Ferris, our Chairman and Chief Executive Officer, has given his assurance that any new hire pilot who comes to work for us during this strike will not be forsaken in any back to work agreement. We will live up to our commitment to you.

*Id.*

19. Plaintiff Lee Rakestraw received identical assurances of management's support and guaranteed pay in United's conditional offer of employment dated June 5, 1985. Pl.Ex. 6. Because the Spillman and Rakestraw offers contain identical promises of job security, guaranteed pay and management support, the court infers that each plaintiff who was hired as a fleet qualified permanent replacement pilot received a written offer of employment containing the same promises.[3]

20. Notably, the Spillman and Rakestraw employment offers do not contain any specific promises that the replacement pi-

---

2. For further examples of the standardized offer sent to fleet qualified pilots, *see* United's Ex. 522, 524, and 525.

3. ALPA and United apparently concede that all plaintiffs received these promises. *See* Krop Aff. ¶ 16 (each pilot "was sent a form letter under the signature of one of [Krop's] subordinates confirming United's employment offer, and the terms of the pilot's employment"). As discussed below, ALPA and United take the position that these written offers contain the *only* promises United made to plaintiffs.

lots would receive seniority rights superior to striking pilots.

21. On April 24, 1985, prior to the strike, United's Senior Vice President–Flight Operations, Lloyd Barry, wrote to all United pilots explaining United's anticipated course of action in the event of a strike. United Ex. 521. The letter explained that United would be hiring permanent replacements for striking pilots. The letter stated that replacements hired as captains and first officers would receive annual salaries of $75,000 and $50,000, respectively. In terms of seniority, the letter provided:

> Current United pilots who continue to work shall be allowed to exercise their seniority over new hire Captains and First Officers as soon as operations permit. *New hire Captains and First Officers will be pay protected at the higher rate even though they may be later reassigned to lower positions.*
> I WANT IT CLEARLY UNDERSTOOD THAT WE WILL PROTECT THE RIGHTS OF THE PRESENT UNITED PILOTS WHO CONTINUE TO PERFORM THEIR FLYING DUTIES DURING A STRIKE. THIS COVERS BOTH PAY AND PERMANENT SENIORITY RIGHTS. WE WILL ALSO PROTECT THE PERMANENT EMPLOYMENT OF ANY NEWLY HIRED PILOTS. THIS COMPANY INTENDS TO REWARD THE LOYALTY OF THOSE PILOTS WHO HELP US KEEP THIS AIRLINE RUNNING.

*Id.* (emphasis added) (capitalized letters in original).

22. The Barry letter thus explained to all United pilots the terms of the offer to strike replacements: (1) they would receive a guaranteed salary of either $75,000 or $50,000, which would not be decreased after the strike; (2) they would not be fired after the strike; and (3) United would support those pilots who worked during the strike. Although the Barry letter promised current United pilots that their pay and seniority rights were protected, the letter made no representation about the seniority rights of the replacement pilots.

23. The fact that replacement pilots were not offered special seniority rights as a term of employment is further evidenced by a letter to United's former manager of Employment and Placement Services, Eugene Krop, from Ray Boyle, a United employee who assisted in recruiting fleet qualified pilots. Pl. Ex. 81. In the letter dated May 8, 1985, Boyle explained to Krop that the fleet qualified pilots objected to the fact that they would be placed behind the 570 on the seniority list on May 17, 1985. *Id.* Boyle stated that he thought United would have to offer more than just an increased salary in order to attract fleet qualified pilots to replace striking pilots. *Id.* However, there is no evidence that United changed its formal offers of employment to include preferential seniority rights for replacement pilots.

24. Indeed, Eugene Krop stated in his affidavit that before sending out the formal employment offers to fleet qualified pilots, United employment representatives were instructed to first telephone the candidate and to extend an oral employment offer limited to two specific terms: (1) permanent employment, and (2) guaranteed salary. Krop aff. ¶ 16. If the candidate accepted, United sent out the formal employment offer memorializing these terms of employment. *Id.* Seniority protection was not a part of the formal offer.

III. The Strike

25. On May 17, 1985, at 12:01 a.m., ALPA began a strike against United. Only 25 of the 570 reported for work on May 17, 1985, and approximately six others reported for work a few days thereafter. Stipulation ¶ 10.

26. Plaintiff George Spillman was hired by United as a fleet qualified captain on May 17, 1985. Hearing Tr. at 23, 24–25. After reporting to work on May 17, Spillman spoke with Bill Traub, United's director of training. *Id.* at 24. Spillman asked Traub about the status of the 570. Traub replied that the 570 had been training for several months, but that they had not been considered United employees. *Id.* at 25–26. Traub also told Spillman that the

570 were supposed to report for work that day, and since they had failed to do so, they would not be United employees. *Id.* at 26.

27. Spillman also had a conversation on May 17, 1985 with United president, James Hartigan. *Id.* This conversation took place in the hallway outside Traub's office. Hartigan told Spillman that the pre-hires who had not reported for work that day would *never* become United employees. *Id.* at 26–27. Spillman asked Hartigan what would happen if the 570 later returned to work. Hartigan replied that the 570 would be placed behind Spillman on the seniority list, because they would be coming to work after Spillman. *Id.* at 27.

28. Later that day, Spillman received and accepted a formal offer of employment from United. *Id.* at 27.

29. On June 5, 1985, plaintiff Richard Lussow went to United's Denver office to accept United's offer of employment as a permanent replacement pilot. *Id.* at 12–13. Lussow testified in his deposition that he and several other new hires asked United personnel officers how many of the 570 had come to work. Lussow was told that only a handful had reported for work; the rest of the 570 were not employees and therefore had no seniority. Lussow Dep. at 54–56.

30. Plaintiffs Lee Rakestraw and Ralph Pate were given similar information when they reported for their first day of work on June 7, 1985 and June 10, 1985, respectively. *See* Rakestraw Aff. ¶ 6, and Pate Aff. ¶¶ 3, 5, attached as Exs. C and A to plaintiffs' memorandum in support of a preliminary injunction.

31. Over the course of the strike, approximately 219 fleet qualified pilots accepted employment. Stipulation ¶ 13. The pilot seniority dates of the fleet qualified pilots range from May 17, 1985 to June 28, 1985. *Id.*

32. During the strike, United also offered employment as student pilots, and eventually as second officers, to candidates who were not yet fleet qualified to be pilots on United's aircraft. Stipulation ¶ 14. By the end of the strike, approximately 320 persons had accepted these offers.[4] Unlike the fleet qualified pilots, the 320 student pilots were not hired pursuant to individual employment agreements. Although the student pilots were hired during the strike, they did not actually begin to work for United until after the strike. Thus, they received seniority dates ranging from July 1, 1985 to July 22, 1985. Stipulation ¶ 14.

33. A small number of applicants who were offered new hire positions during the strike refused to accept them because of the strike. Samolis Aff. ¶ 12. Approximately 15 of these pilots were eventually hired by United after the strike concluded. These pilots are called "the class of 1985." *Id.* The class of 1985 received seniority numbers based on the day they initially reported for work. Thus, the class of 1985 received seniority dates later than they would have received had they accepted United's earlier offer of employment. *Id.*

34. During the strike, Lussow attended two different meetings for new hires and other pilots who had crossed the picket lines. Hearing Tr. at 13–15. At the first meeting, Lloyd Barry, United's Senior Vice President–Flight Operations, told the assembled group that the 570 were not United employees and had no seniority because they did not report for work on the first day of the strike. *Id.* at 14. At the second meeting, Richard Ferris, United's Chairman of the Board, said that the 570 prehire trainees who did not report to work on May 17: (1) were not employees; (2) had no seniority; and (3) would never have seniority above the permanent replacement pilots. *Id.* at 15.

IV. 1985 Back to Work Agreement

35. After extensive negotiations supervised by the NMB, United and ALPA signed a back to work agreement on June 15, 1985, formally terminating the 29–day strike. Stipulation ¶ 15. The back to work

---

4. Thus, a total of 539 replacement pilots were hired during the strike. The complete group of replacement pilots have been labelled "the group of 539" or "the 539" in various documents filed in this case.

agreement provided that striking pilots would be allowed to return to work and assume their pre-strike positions with normal seniority accrual. *ALPA v. United Air Lines,* 614 F.Supp. at 1038. ALPA and United agreed that there would be no reprisals or recriminations against pilots for either striking or crossing the picket lines. *Id.* at 1038–39. United refused to rehire the 570; the parties agreed that the issue of whether United was required to rehire the 570 would be litigated in federal court. *Id.* at 1039; Stipulation ¶ 16.

36. On July 15, 1985, United's Senior Vice President–Flight Operations, Lloyd Barry, sent a letter to all fleet qualified replacement pilots thanking them for their support during the strike. Pl.Ex. 84. Barry's letter states:

> I know that the decision you made to join this company as a Fleet Qualified pilot was not an easy one, but was embraced with great professional career expectations. I respect the courage and loyalty demonstrated by your decision.

*Id.* Barry went on to explain that United was vigorously defending its right to hire replacement pilots and the guaranteed salary package. Barry stated "[w]e are optimistic that our actions will be upheld, thereby allowing us to honor our commitments to you." *Id.*

## V. Litigation Concerning the Strike

### A. *Judge Bua's Order*

37. After the strike, ALPA sued United in federal court contending, among other things, that United violated the RLA by refusing to employ the 570 after the strike. After a ten-day bench trial, Judge Bua held that the 570 became United employees on May 17, 1985, and that United violated the RLA by refusing to recognize the status of the 570 as employees on that date. *ALPA v. United Air Lines,* 614 F.Supp. at 1043, 1051. Judge Bua ordered United to extend employee status to the 570 and to immediately assign the 570 who had completed training to line pilot service. *Id.* at 1051. Judge Bua directed United to grant the 570 seniority as of May 17, 1985. *Id.*

38. Judge Bua later modified his order to require United to place the 570 on a preferential hiring list for all available positions in the future, instead of mandating immediate reinstatement of the 570. *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.,* 616 F.Supp. 849, 851–52 (N.D. Ill.1985).

39. In compliance with the modified order, United placed the 570 on a preferential recall list, and recalled those who desired to continue employment with United, beginning on November 9, 1985. Stipulation ¶ 16. Each recalled pilot from the group of 570 received a seniority date of May 17, 1985. Seniority within the recall group was ordered according to each pilot's first day of training in 1984 or 1985. *Id.* ¶ 17. In other words, while the entire recall group received a seniority date of May 17, 1985, the recalled pilots were placed on the seniority list relative to each other based on each pilot's initial training date.

40. On August 15, 1985, Lloyd Barry sent a letter to all pilots hired as replacements during the strike. The letter provided in relevant part:

> [W]e recognize that Judge Bua's decision has a profound impact on you. In that ruling, which we will also challenge on appeal, the Judge found that the [570] were in fact employees and were entitled to seniority dates of May 17, 1985. The obvious effect of this ruling, if not overturned on appeal, is to place those [570] pilots on the seniority list as of that date, ahead of the replacement pilots.
>
> The appeal process can be a lengthy one. In the meantime, however, be assured that United will stand behind those pilots to whom it committed permanent replacement positions....

Pl.Ex. 59.

### B. *The Seventh Circuit Decision*

41. On September 30, 1986, the Seventh Circuit reversed the district court on the issue of the 570's employment status. *Air Line Pilots Ass'n Int'l v. United Airlines, Inc.,* 802 F.2d 886 (7th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). Specifically, the Seventh Circuit held that as of May 17, 1985,

the 570 were not "employees" as defined under the RLA, and therefore United did not violate the RLA in conditioning the 570's employment on crossing picket lines. *Id.* at 911–17 (7th Cir.1986). The court explained that:

> The definition of employee under the [RLA] makes it clear that a person must perform work for his employer under that employer's supervision to be deemed an employee. Members of the Group of [570] failed to perform any services for United and were hence never employees for the airline.

*Id.* at 913 n. 9.

42. Contrary to plaintiffs' repeated assertions, the Seventh Circuit did not address the issue of the 570's seniority.

43. On March 30, 1987, the Supreme Court denied ALPA's petition for certiorari. *ALPA v. United Air Lines,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). As a result, United claimed it was free to terminate the 570. Stipulation ¶ 18.

## VI. The 1987 Letter of Agreement

44. Instead of immediately firing the 570, United entered into negotiations with ALPA to retain the 570 as United employees, but to adjust their seniority dates to November 9, 1985, the date United recalled the first of the 570 pursuant to Judge Bua's order. Samolis Aff. ¶¶ 4–7.[5]

45. In these negotiations, United took the position that if no agreement were reached with ALPA on the 570 issue, United would terminate them. *Id.* ¶ 6. ALPA believed that United management insisted on adjusting the seniority of the 570 because they wished to punish ALPA and the 570 for their role in the strike. Smith Decl. ¶ 19. However, under the RLA, ALPA had no right to strike over the issue. Samolis Aff. ¶ 6.

46. On April 3, 1987, United informed ALPA that it would immediately discharge the entire group of 570 unless ALPA entered into a collective bargaining agreement that would adjust the seniority of the 570. Stipulation ¶ 19.

47. Left with no alternative, ALPA acquiesced. Thus, on April 3, 1987, United and ALPA executed the 1987 letter of agreement setting forth the following terms:

a. United agreed to immediately extend employment offers to each member of the 570 for a pilot's position. United Ex. 527 ¶ 1.

b. United would adjust the seniority date of each member of the group of 570 from May 17, 1985 to November 9, 1985, the actual recall date of the first member of the 570. *Id.* ¶ 2.

c. ALPA agreed that the seniority dates and numbers assigned to the 570 would be final. In particular, ALPA agreed that:

> it will never seek to challenge [United]'s action in that regard in court or before an arbitrator, nor will it seek to raise the issue of the "Group of 570" relative seniority position as part of any future negotiations between [United] and [ALPA] regarding any subject whatsoever.

*Id.* ¶ 3.

d. As a condition of employment, each member of the 570 was required to sign an individual written document releasing United and ALPA from any and all liabilities relating to the 1987 letter agreement or to the 570's period of employment pursuant to Judge Bua's order. *See id.* ¶ 4 and accompanying "RELEASE."

e. ALPA agreed:

> to take extensive active measures to eliminate the residual tension between those pilots who struck and those who worked during the strike, including activities which might constitute reprisals or recriminations as a result of the 1985 ALPA strike (e.g., any worker lists, workplace ostracism or harassment).

*Id.* ¶ 5.

f. United agreed to take extensive active measures to restore a positive working

---

5. John Samolis currently holds the position of Vice President, Employee Relations at United. Samolis Aff. ¶ 1. Samolis represents United in its labor relations with various unions, including ALPA. *Id.*

relationship with all pilots, and to eliminate any activities that might constitute reprisals or recriminations as a result of the 1985 ALPA strike. *Id.* ¶ 6.

g. United and ALPA acknowledged that the 1987 letter agreement "fully, finally and forever" resolved all disputes between United and ALPA regarding the 570. United Ex. 527 at 1.

48. Three days after signing the 1987 letter agreement, Lloyd Barry sent a letter to all United pilots calling for reconciliation and asking each pilot to respect the terms of the 1987 letter agreement. Pl.Ex. 5. Barry's letter stated:

> Of all the issues relating back to the strike, the 570 has been among the last to be resolved, and certainly the most painful. We have always regarded the men and women in the group of 570 as valuable pilots, and it was truly unfortunate that they were caught in the middle while the courts decided the far-reaching institutional questions posed by ALPA and United. I ask that you honor the commitment that ALPA, as your representative voice, has made to put the war behind us.

*Id.*

49. Although ALPA contends that it was coerced into signing the 1987 letter agreement and that it never intended to abandon the 570 seniority issue (*see* Pl.Ex. 131), there is evidence that ALPA did at least initially intend to honor the 1987 letter agreement. On March 8, 1988, the Chairman of the UAL–MEC negotiating committee, Pat Austin, sent a letter to each member of the 570. Pl.Ex. 28. The letter acknowledged that many of the 570 still wanted ALPA to renegotiate the 570 seniority issue. However, the letter stated that:

> It was the decision of the Master Executive Council, articulated by Captain Dubinsky, that [ALPA], and its Officers, must and will abide by their agreements: to do otherwise would destroy our credibility and result in a questioning of the integrity of [ALPA] and its Officers.

    \*    \*    \*    \*    \*    \*

Maybe with 20/20 hindsight we all can develop other ways in which this problem could have been solved, but based on what the parties had to deal with at the time, decisions were made and agreements were reached and we must live with those agreements in the same manner we would expect United to honor its agreements with [ALPA].

*Id.*

50. Nevertheless, it is clear that ALPA has always considered itself coerced into signing the 1987 letter agreement, and considered the agreement unfair punishment against those members of the 570 who honored ALPA picket lines. Smith Decl. ¶ 19–21; George Aff. ¶ 5; Samolis Aff. ¶ 8. Indeed, it does appear that United sought to punish the 570 for striking. Under the 1987 agreement, 33 non-striking pilots from the 570 maintained seniority ahead of the replacement pilots. These 33 pilots maintained their seniority dates of May 17, 1985, while all striking 570 pilots had their seniority dates and corresponding numbers placed behind the replacement pilots. Smith Decl. ¶ 22.

51. Thus, despite the finality of the language in the 1987 letter agreement, from April 1987 to the present, ALPA has repeatedly and consistently informed United and United pilots that ALPA urgently desired to renegotiate the terms of the 1987 letter agreement and to restore the seniority dates of the 570 to May 17, 1985. Smith Decl. ¶ 21; George Dep. at 60–68; Pl.Exs. 13, 15, 16, 40, 45, 78, 119.

### VII. The Colorado Litigation

52. In May 1988, the 570 filed a class action in Colorado state court against United for breach of contract and misrepresentation in connection with their relative seniority. *DeJean v. United Air Lines*, No. 88 CV 9474 (D.Colo.1988). *See* Pl.Ex. 115 at 3. The 570 claimed that United promised they would be hired in order of seniority numbers assigned during their training period. *Id.* at 1.

53. The trial court granted United's motion for summary judgment on the grounds that: (1) *res judicata* precluded the 570

from litigating issues that could have been raised in the 1985 litigation before Judge Bua; and (2) the 570 were barred from litigating the seniority issue against United because they had signed individual releases absolving United from all claims regarding the 570's seniority status. *Id.* at 5–10.

## VIII. Employee Stock Ownership Negotiations

54. Within days after signing the 1987 letter agreement, the MEC, headed by Dubinsky, proposed a plan for the pilots to buy United. A prominent reason for this plan was ALPA's dissatisfaction with United management's treatment of the 570 issue. *See* Pl.Ex. 22 at 3–4; Smith Decl. ¶ 25. United management rejected the pilots' offer. *See* Pl.Ex. 66.

55. For approximately two years after United's rejection of the first MEC proposal, ALPA continued in its efforts to enable United pilots and employees to buy United. Smith Decl. ¶¶ 25–26. The subject of restoring the seniority of the 570 was consistently raised during these negotiations. Smith Decl. ¶ 26; Pl.Ex. 13; George Dep. at 60–68.

56. In August 1989, an outside party attempted to purchase United. George Aff. ¶ 7. United management responded by joining forces with ALPA to create a joint buyout of United through an employee stock ownership plan ("the buyout plan"). *Id.* During United's negotiations with ALPA regarding the possible buyout plan, ALPA formally proposed that in the new collective bargaining agreement, the pilot seniority dates of the 570 should be adjusted to May 17, 1985. *Id.* After initially resisting, United agreed to this proposal. *Id.;* Pl.Ex. 15.

57. The proposal was never implemented, because the buyout plan between United and ALPA failed for lack of financing. George Aff. ¶ 8.

## IX. 1991 Collective Bargaining Agreement

58. In April 1988, United hired its current Senior Vice President—Human Resources, Paul George. George Aff. ¶ 1.

At the time he joined United, George became aware of the extremely bitter relationship between ALPA and United resulting from the 1985 strike. *Id.* ¶ 2. George decided to place top priority on resolving any disagreements over the 1985 strike in order to restore normal, mutually productive relations between United and ALPA. To achieve this objective, George believed it was necessary to reach a new collective bargaining agreement with ALPA to replace the 1985 agreement, which became amendable on April 1, 1988. *Id.*

59. Shortly after joining United in 1988, George met with MEC chairman Rick Dubinsky to discuss United's relationship with ALPA. Dubinsky told George that United would not have labor peace, and that there would be no agreement on a new collective bargaining agreement, without first resolving the issue of the 570's seniority. *Id.* ¶ 3.

60. Over the next year and a half, George had several informal conversations with ALPA representatives who reiterated the position that the 570 should be granted seniority dates of May 17, 1985. *Id.* ¶ 4.

61. ALPA justified its position on several grounds. First, May 17, 1985 was the seniority date that the 570 would have received but for their decision to honor the ALPA picket line. *Id.* Historically, all other United pilots had received seniority dates based on the pilots' initial training date. ALPA believed that the 570 were unfairly punished solely because of their decision to strike. ALPA also told George that as the certified bargaining representative for the 570, ALPA had a duty to fulfill its promise to the 570 to protect their seniority rights. *Id.* ¶ 5.

62. According to George, he initially resisted ALPA's requests to renegotiate the seniority of the 570, because he felt that United could obtain a new collective bargaining agreement without acquiescing in ALPA's demands. *Id.* ¶ 6. At the time, George understood ALPA's concerns, but concluded that since the battle over seniority had previously been resolved, the issue was best left alone. *Id.*

63. During the buyout negotiations, normal collective bargaining negotiations between United and ALPA were suspended. Smith Decl. ¶ 27; Stipulation ¶ 21. However, when it became clear in October 1990 that the last of the employee buyout proposals had failed, United urged ALPA to engage in immediate, expedited collective bargaining negotiations. *See* letter dated October 9, 1990 from John Samolis to Pat Austin, attached to Smith Decl. as ALPA Ex. G. *See also* Pl.Ex. 118.

64. On October 22, 1990, Dubinsky wrote to Paul George and demanded that United resolve the 570 seniority issue before commencing formal negotiations. Pl.Ex. 16. According to Dubinsky:

The acceptable solution is well known to management. It is on the same terms as formally agreed to by [certain United management officials] (and approved by the UAL Board) in the management led [buyout] effort during the fall of 1989. *Id.*

65. George responded to Dubinsky by stating that:

I believe we all agree that the "570" and "Class of '85" are both sensitive issues and should be addressed promptly in a manner which is fair and equitable to all affected pilots.

Pl.Ex. 18. However, George refused to settle the 570 issue prior to negotiating. Instead, George proposed addressing the 570 issue together with the other issues in the collective bargaining negotiations. *Id.*

66. A subsequent exchange of letters resulted in ALPA agreeing to negotiate the 570 seniority issue along with the other issues in formal collective bargaining negotiations. *See* Pl.Ex. 120; Letter of November 6, 1990 from Dubinsky to George, attached as ALPA's Ex. G to Smith Decl. *See also* Pl.Ex. 40.

67. As negotiations between United and ALPA progressed, it became apparent that United was willing to grant ALPA's demand that seniority for the 570 and the class of 1985 be placed ahead of the replacement pilots, in exchange for ALPA

concessions. For example, in a letter dated February 19, 1991 from the MEC to its "fellow pilots," Pat Austin gave the following status report on the negotiations:

The issue of the 570/Class of '85 also remains to be resolved; we remain optimistic that a satisfactory resolution to this issue can be reached, however management places a high price tag on this item and there is a certain degree of time criticality involved.

Pl.Ex. 45.

68. In a confidential mediation session between ALPA and United on February 25, 1991, John Samolis of United expressed the view that the 570 issue would be solved, and that there "will be lawsuits no matter what." Samolis saw the issue as a "big chip" that had to have some ALPA concessions tied to it before United would agree. Pl.Ex. 48.[6]

69. In April 1991, United and ALPA tentatively agreed on all provisions of a new collective bargaining agreement, subject to MEC ratification. Stipulation ¶ 25. As part of the proposed 1991 collective bargaining agreement, United and ALPA drafted a letter of agreement regarding the seniority of the 570 and class of 1985. *Id.;* Pl.Ex. 4; United Ex. 536. The new letter of agreement readjusts the pilot seniority and longevity of the 570 to May 17, 1985. *Id.* Seniority and longevity for pilots from the class of 1985 currently employed by United would be adjusted to the date on which each pilot would have commenced training. *Id.* The seniority and longevity adjustments are to have prospective effect only. *Id.* Paul George of United stated that the adjustment is reasonable, in that it remedies past punishment of the 570 for striking, and it grants seniority dates to the 570 based on the date they originally were offered employment, May 17, 1985. George Aff. ¶ 17.

70. On April 5, 1991, Dubinsky wrote a letter to John Busch explaining:

[A]s you probably know by now, we have been deeply involved in contract negotiations culminating in a tentative agree-

---

**6.** United's objections to plaintiffs' Ex. 48 on grounds of relevance and hearsay are overruled.

ment on most issues, late the evening of April 2, 1991.

As part of that agreement, I am pleased to report that the company has agreed with ALPA to restore the "570" and "Class of 85" to their rightful seniority. As you should know, the reversal of the vindictive act that [United's former management officials] perpetrated on the United pilots in April 1987 has been among the highest objectives of the UAL–MEC. At no time did we loose (sic) faith with that objective as evidenced in the most recent agreement.

Pl.Ex. 78.

71. On May 9, 1991, the MEC ratified the tentative collective bargaining agreement; ALPA's president signed the agreement on May 10, 1991. Stipulation ¶ 25.

72. Effective June 1, 1991, the seniority provisions of the new collective bargaining agreement will adversely affect the group of 539, consisting of fleet qualified replacement pilots and new hire pilots who were hired as student pilots during the strike. Approximately 490 replacement pilots from the group of 539 are currently United pilots. Smith Decl. ¶ 37. Of these 490 pilots, 270 are now ALPA members. *Id.* Of the original group of 570, approximately 460 remain United pilots today. *Id.* ¶ 38. Under the 1991 agreement, the 33 pilots of the group of 570 who crossed the picket lines in 1985 will not be placed behind the remaining 570 striking pilots on the seniority list. *Id.* All 460 members of the group of 570 shall be placed ahead of the 490 members of the group of 539 on the seniority list; the 570 will receive seniority dates of May 17, 1985 and relative seniority numbers based on their initial day of training. *Id.*

73. United is now convinced that a readjustment of the seniority dates of the 570 is necessary in order to place all pilots in the position they would have been in had there not been a strike. *See* Pl.Ex. 57. Further, United contends that placing the 570 ahead of the replacement pilots on the seniority list will benefit all employees, including the replacements. George Aff. ¶ 19. The replacement pilots will keep their current positions, and receive improved benefits under the new collective bargaining agreement. *Id.* In addition, with a new agreement, United will be able to expand, thereby opening up additional promotion opportunities so that the negative effects of the seniority adjustment will be ameliorated. *Id.* United also asserts that this resolution will work to eliminate residual tension between pilots who worked during the 1985 strike and those who honored ALPA picket lines. *Id.*

## X. ALPA's Attitude Toward Pilots Who Worked During the Strike

74. Despite United and ALPA's purported resolve to abolish any animosity between strikers and non-strikers, there is substantial evidence that union employees—and indeed the union itself—have expressed hatred and contempt for the replacement pilots and United pilots who crossed the picket line in 1985.[7] Pilots who worked during the strike continued to suffer the effects of the strikers' anger for nearly six years after the strike's end.

75. A letter from then-Senior Vice President of Flight Operations, Lloyd Barry, to each fleet qualified pilot, dated July 15, 1985, demonstrates United's awareness that replacement pilots were being harassed by pilots who had honored the picket line. Barry states in his letter:

I am aware of the pressures you are under while you carry out your current

---

**7.** Plaintiffs submitted over 130 exhibits, many purporting to prove union hostility. United objects to statements made by ALPA representatives, and ALPA objects to statements made by United personnel. Of course, the court understands that any statements made by ALPA may not be attributed to United or used to prove United's wrongful conduct. The same principle applies to statements made by United personnel as to ALPA's alleged wrongful conduct. Thus, most of plaintiffs' exhibits are admissible over defendants' objections of relevance and hearsay. However, defendants' objections to plaintiffs' exhibit 134 are sustained. Exhibit 134 purports to represent a transcript from a televised program called "West 57th Street." This exhibit is inadmissible because it is hearsay, nor have plaintiffs established a foundation for the transcript.

assignment. We cannot regulate or enforce attitudes, but we are investigating all incidents and handling them appropriately.... Time is a great healer, but we are not going to sit idly by and allow you to take unnecessary heat while this emotional era slowly subsides....

Pl.Ex. 84.

76. Another example of the union's hostility towards pilots who worked during the strike is a letter addressed to "All Council 34 Pilots" from Patrick Flanagan, the chairman of local ALPA Council 34. In the letter dated July 24, 1985, Flanagan states:

First, let's get one thing straight. Our issue is with the scab pilots, not the Company. Because we are the Company. Our wrath and rage should be properly directed towards those who were willing to take our jobs and our profession. There is no way we can ever forgive those people....

I will say it a thousand times before I am through. The best proven method of treating scabs is ostracism.

Pl.Ex. 85.[8]

77. In October 1987, ALPA amended its constitution to deny union membership to any pilot receiving compensation exceeding the established pilots' salary under the collective bargaining agreement. Pl.Ex. 100. This barred membership of the fleet qualified replacement pilots who received salaries of $75,000 or $50,000 under their individual employment contracts with United.

78. After amending the union's constitution, the MEC sent letters to the fleet qualified pilots asking them to relinquish any extra pay they received as a result of their individual employment agreements with United. *See* Pl.Ex. 95, 99.

79. In a deposition taken in another case on June 1, 1988, Dubinsky, the chairman of the MEC, testified that "[t]he world knows that we intend to eliminate the fleet qualified pay on this property." Pl.Ex. 102 at 318. When asked to describe the fleet

qualified United pilots, Dubinsky stated "[f]or the most part, they are the scabs that were hired during the strike of '85." *Id.* at 309.

80. In February 1989, Dubinsky sent letters to several fleet qualified pilots who had become union members after the strike. In each letter, Dubinsky stated:

I have recently become aware that you have previously been granted membership in [ALPA] even though you may have been in violation of certain provisions of the Constitution and By–Laws, specifically [the section that prohibits] "Entering into an Employment Agreement or any Contract which may Injure the Association ... I now formally demand you immediately repudiate your "personal employment agreement" with United Airlines and maintain your future employment with United solely pursuant to the provisions of the ALPA Collective Bargaining Agreement with United Airlines....

Pl.Exs. 105–08.

81. When fleet qualified replacement pilots refused to repudiate their individual employment agreements, Dubinsky filed formal charges against them for violating the ALPA constitution. Pl.Exs. 109–112.

82. More subtle union hostility to the fleet qualified replacement pilots is evidenced in the September 1989 Labor Day edition of the "Bayliner," an official ALPA publication of Council 34. Pl.Ex. 114.[9] The cover of the issue contains a cartoon drawing of a union pilot having a "Labor Day Dream." The dream is illustrated by a graveyard containing a tombstone that reads "50/75—1985–89." *Id.* The picture represents the union's dream of "death" to the fleet qualified pilots' extra pay.

83. The February edition of "Banner," the newsletter of ALPA's local Council 12, contains an article entitled "the 570." Pl.Ex. 41. In the article, a member of the

---

**8.** ALPA argues that exhibit 85 is hearsay because the statements were not made by an authorized ALPA representative. The court infers that statements made by a local ALPA council chairman evidence the attitudes of ALPA and its

members. This objection is overruled. Fed.R. Evid. 801(d)(2).

**9.** ALPA's objection to exhibit 114 is overruled for the reasons stated in note 8.

group of 570 recounts the events of 1985 that gave rise to the seniority dilemma. The article describes the fleet qualified pilots as "mercenary soldiers-of-fortune," who "came on the property after answering ads promising them $50,000 or $75,000 a year...." The author then quips, "I guess every man has his price." *Id.*

84. The Banner expressly states that "the opinions expressed in this publication do not necessarily represent official ALPA policy...." *Id.* However, taken in connection with other evidence of union hostility, it is reasonable to infer that ALPA officers shared the hostility expressed in the Banner against fleet qualified pilots.

85. Plaintiffs' exhibit 77 belies ALPA's claim that the union never officially manifested contempt for the fleet qualified pilots. In this letter dated February 8, 1991, ALPA MEC chairman Dubinsky writes the following to George Raymond, a United pilot who works at United's Denver training center:

George, next time you look in the mirror, remember that the face you see staring back belongs to an individual who AC-TIVELY WORKED TO TRAIN FLEET QUALIFIED SCABS TO REPLACE HIS FRIENDS. I certainly won't forget.

Pl.Ex. 77 (capitalized letters in original).

86. Moreover, on March 9, 1991, ALPA Council 11 sent a letter to its members inviting them to a kick-off rally for proposed federal legislation that would make it illegal for employers to hire permanent replacement workers during a strike. The invitation explains:

This is significant for us. At United, we have living proof of this contemptible practice. We have FLEET QUALS.

Pl.Ex. 123 (capitalized letters in original).

87. The most recent manifestation of union hostility toward fleet qualified pilots occurred as a result of the present litigation. On April 20, 1991, plaintiff Richard

Lussow was in the pilot mail room in the San Francisco dispatch facility. Hearing Tr. at 15. Lussow stopped to read some literature that was posted on a locked bulletin board maintained by ALPA. *Id.;* ALPA Ex. 1015. The first page of plaintiffs' complaint in this case was tacked to the bulletin board under a sheet of glass. Hearing Tr. at 16. Next to the list of plaintiffs' names, someone had written in blue ink "Never forgive, never forget. Now is the time to show these people how we really feel." *Id.* Reading this scrawled message made Lussow feel as if the union ostracism following the 1985 strike was starting over again. *Id.*

88. On May 8, 1991, Dubinsky sent a memorandum to all ALPA field offices and council offices, stating:

We are informed that comments concerning the "570" seniority litigation have been placed both inside and outside union bulletin boards. ALPA, of course, has not authorized or sanctioned any such comments, and the personal views of individual pilots do not in any way reflect ALPA's policies....

Please immediately pull all references to the seniority lawsuits from both the inside and the outside of our bulletin boards (or walls) at ALPA offices and those in dispatch offices. Yes, I know that we all have rights of free speech and that we do not control what individuals say, but let's pull down anything we see on this subject. I am asking that you accomplish this immediately....

ALPA Ex. 1015. At the time Dubinsky drafted this memorandum, the parties in this case were in the midst of briefing plaintiffs' motion for a preliminary injunction, which is premised in part on allegations of union hostility toward fleet qualified pilots. Dubinsky's memorandum is a disingenuous effort to dispel the notion that the union harbors ill-will toward the fleet qualified pilots.[10]

---

**10.** ALPA submits a "Summary of ALPA member data concerning the group of 539" in order to show that some of the pilots who were hired during the strike are ALPA members who also stand to suffer from the new seniority provision. ALPA Ex. 1012. However, plaintiffs' ob-

jections to this document are sustained. Exhibit 1012 was prepared on May 8, 1991, apparently for the purpose of this litigation. There is no foundation for this list of pilots. ALPA has not identified the preparer of the list or the source of the data. Additionally, plaintiffs' objections

89. ALPA has taken the following measures to alleviate tensions between striking and non-striking pilots:

a. ALPA hired someone to ensure that the union's official publications and communications do not contain inflammatory language regarding the 1985 strike. Hearing Tr. at 43–44.

b. ALPA appointed a pilot who worked during the strike to serve on ALPA's professional standards committee as a representative of non-striking United pilots. *Id.*

c. ALPA's employee assistance program offers aid to any pilot who has encountered difficulties in employee relations. *Id.* at 44.

90. Considering the extensive evidence of animosity and tension between strikers and non-strikers, ALPA's efforts have failed to ease relations among pilots. Indeed, the evidence suggests that far from remaining neutral toward the group of 539, ALPA has nurtured a six-year vendetta against the 539 and the fleet qualified pilots in particular. ALPA and its members have repeatedly shown contempt for the fleet qualified pilots, and this contempt has not been limited to the issue of fleet qualified pay, as ALPA suggests. It is impossible to separate the union's aversion to fleet qualified salary from the union's hostility toward fleet qualified pilots.

91. ALPA asserts that it has not engaged in discriminatory conduct in constantly pressing United to readjust the 570 seniority ahead of the replacement pilots. As evidence of ALPA's non-partisan motives, ALPA points to the fact that the 33 non-striking pilots from the group of 570 shall not be placed behind the striking 570 under the new collective bargaining agreement. ALPA argues that this fact eliminates any taint of discrimination against

non-striking replacements. However, the evidence clearly demonstrates that ALPA's campaign to adjust pilot seniority rights was not motivated by ALPA's desire to treat all pilots similarly.[11] Instead, ALPA repeatedly lobbied *on behalf* of the group of 570 and the class of 1985 and *against* the fleet qualified pilots. The fact that ALPA has finally achieved its goal is not undermined by the fact that the 33 non-striking pilots from the group of 570 shall not have their seniority taken away from them under the 1991 agreement. Nearly 500 replacement pilots will be set back by approximately 460 positions on the seniority list as a result of ALPA's negotiating efforts.

92. In negotiating the current seniority adjustment, ALPA has discriminated against pilots who crossed ALPA picket lines and in favor of the 570 and class of 1985 pilots who did not work during the strike. While some of the adversely affected pilots are now ALPA members, they, like plaintiffs, chose to work during the strike and are therefore also the object of ALPA's contempt.

93. For six years following the 1985 strike, ALPA has consistently pushed to advance the interests of the 570 and the class of 1985, at the expense of pilots who worked during the strike. Only strikers will benefit from this seniority adjustment, while the 539 replacement pilots and new hires will suffer.[12]

## CONCLUSIONS OF LAW

I. Count I: Against United and ALPA for Breach of Duty of Fair Representation

A. *Applicable Law*

1. Under the RLA, a union representative, elected by a majority of employ-

---

to exhibit 1012 are sustained on hearsay grounds.

**11.** It bears noting that the 1991 collective bargaining agreement does not, as ALPA and United contend, grant the 570 seniority rights based on their first day of training. Instead, ALPA and United have agreed to grant the 570 seniority dates of May 17, 1985, the day they *would have been hired but for their decision to strike.*

Thus, United and ALPA are clearly wrong in asserting that the 570 will now be treated like all United pilots by receiving seniority dates based on their first day of training.

**12.** The 33 non-striking pilots from the group of 570 will be neither punished nor rewarded under the 1991 agreement. They will retain their current seniority.

ees, acts as the exclusive bargaining agent for all employees in collective bargaining negotiations with the employer. 45 U.S.C. § 152, Fourth. Although a union representative is chosen by a majority of the employees, the bargaining agent has a duty to fairly represent the interests of all employees, regardless of union membership. *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

■ 2. A union's duty of fair representation extends to the union's actions in negotiating collective bargaining agreements. *Air Line Pilots Ass'n, Int'l v. O'Neill*, —— U.S. ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991); *Air Wisconsin Pilots Protection Comm. v. Sanderson*, 909 F.2d 213, 216 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 958, 112 L.Ed.2d 1045 (1991). Thus, in its negotiating capacity, a union must "serve the interests of all members [of the bargaining unit] without hostility or discrimination toward any [bargaining unit member], to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.*, quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967) (citations omitted). A union's actions are not considered arbitrary unless they fall so far outside a "wide range of reasonableness" that they are "wholly irrational." *O'Neill*, 111 S.Ct. at 1136, quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

■ 3. The duty of fair representation does not require that a union achieve absolute equality among its members; the nature of collective bargaining may require a union to differentiate among employees in a variety of contexts. *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686; *Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221 (2d Cir.1989); *Alvey v. General Elec. Co.*, 622 F.2d 1279, 1287 (7th Cir.1980). As the Supreme Court recently noted:

> Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union.... Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.

*O'Neill*, 111 S.Ct. at 1135.

■ 4. A union does not breach its duty of fair representation unless it "intentionally causes harm to an employee." *United Indep. Flight Officers v. United Air Lines*, 756 F.2d 1274, 1282 (7th Cir.1985), quoting *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir.1981).

■ 5. Although union negotiations enjoy substantial deference from the courts, it is improper for a union "to offer to change contract practices of long standing arbitrarily, for the sole purpose of benefiting a stronger, more politically favored group over a minority segment of the union." *Alvey*, 622 F.2d at 1287 n. 8. *See also Air Wisconsin*, 909 F.2d at 217 ("an attempt by a majority of the employees in a collective bargaining unit to gang up against a minority of employees ... could itself be thought a violation of the duty of fair representation by the union that the majority used as its tool").

■ 6. Seniority rights are not vested; they are created through the collective bargaining process and derive their scope and significance from union contracts. *United Food & Commercial Workers Int'l Union v. Gold Star*, 897 F.2d 1022, 1026 (10th Cir.1990); *Schick v. N.L.R.B.*, 409 F.2d 395, 398 (7th Cir.1969); *Ferrara v. Pacific Intermountain Exp. Co.*, 301 F.Supp. 1240, 1243 (N.D.Ill.1969). Thus, a union is free to renegotiate the method of allocating employee seniority rights, so long as the union's position does not offend the duty of fair representation owed to all employees. *Barton Brands, Ltd. v. N.L.R.B.*, 529 F.2d 793, 798–99 (7th Cir.1976); *Papcin v. Dichello Distrib., Inc.*, 697 F.Supp. 73, 80–81 (D.Conn.) *aff'd*, 862 F.2d 304 (2d Cir.1988). When a new collective bargaining agreement abridges established seniority rights of a minority of employees, "the [u]nion must show some objective justification for its conduct beyond that of

placating the desires of the majority of the unit employees at the expense of the minority." *Barton Brands*, 529 F.2d at 798–99.

■ 7. An employer may be held jointly and severally liable for colluding with the union in conduct that constitutes a breach of the union's duty of fair representation. *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 798 (2d Cir.1974); *United Indep. Flight Officers v. United Air Lines*, 572 F.Supp. 1494, 1508 (N.D.Ill.1983) ("an employer may be held liable along with a union for breach of the duty of fair representation").

B. *United's and ALPA's Conduct in Negotiating the 1991 Collective Bargaining Agreement*

■ 8. Although ALPA may have a legitimate goal in attempting to remedy United's past punishment of *some* of the strikers,[13] the Seventh Circuit has determined that United's actions toward the 570 and the class of 1985 were not illegal. *ALPA v. United Air Lines*, 802 F.2d 886 (7th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). Thus, United and ALPA were free to negotiate the 1987 letter of agreement placing the seniority of the 570 and class of 1985 behind the group of 539. Once that agreement was negotiated, however, ALPA breached its duty of fair representation by repeatedly lobbying United to again reverse the seniority order. In so doing, ALPA championed the cause of the politically powerful group of 570 to the detriment of a disfavored minority group. ALPA has unfairly abrogated the legitimately-negotiated seniority status that plaintiffs have relied upon for four years.

9. Overwhelming evidence demonstrates that ALPA bitterly opposed the very existence of fleet qualified pilots. Plaintiffs have therefore proven by a preponderance of the evidence that in negotiating the 1991 collective bargaining agreement, ALPA unfairly discriminated against the 539, and the fleet qualified pilots in particular.

10. It is of no consequence that there is a rational basis for granting the 570 and the class of 1985 seniority as of May 17, 1985. Indeed, United and ALPA concede that due to the unusual turn of events over the past six years, the seniority of the 570 and the class of 1985 could be logically determined in a number of ways. However, ALPA and United had previously negotiated the 1987 letter agreement as a permanent solution to the dispute over the 570's seniority. That "final" solution placed the seniority of the 570 and the class of 1985 *behind* the replacement pilots and new hires. All United pilots, including plaintiffs, relied on the 1987 letter of agreement as a final resolution to the seniority issue. ALPA has acted in bad faith in negotiating to reverse the relative seniority rights of the 539 in the 1991 collective bargaining agreement.[14]

■ 11. Plaintiffs have failed to establish by a preponderance of the evidence that United acted in bad faith or discriminated against plaintiffs in accepting ALPA's proposal. The evidence demonstrates that for several years after the strike, United staunchly protected the interests of the 539 to the extent possible. While there is some evidence showing that United has sought to achieve labor peace by sacrificing the seniority of the group of 539, United's current change in position is not a result of hostility or contempt for the

---

**13.** United did not punish all pilots who struck; established United pilots who refused to work during the strike were allowed to return to work after the strike with no adverse effect on their seniority. Stipulation ¶ 15; *ALPA v. United Air Lines*, 614 F.Supp. at 1038. Only the 570 and the class of 1985 were denied employment and seniority following the strike. *Id.*

**14.** ALPA observes that plaintiffs cannot sue ALPA for breach of its promise in the 1987

letter agreement never again to raise the 570's seniority issue. *See Battle v. Clark Equip. Co.*, 579 F.2d 1338, 1347 (7th Cir.1978) *overruled on other grounds, Rupe v. Spector Freight Systems*, 679 F.2d 685 (7th Cir.1982). However, *Battle* does not prevent plaintiffs from seeking relief based on ALPA's breach of the duty of fair representation. In this regard, the fact that ALPA has completely ignored its commitment to never reopen the 570 seniority issue serves as evidence of ALPA's bad faith.

539 or plaintiffs in particular. Instead, United has agreed to adjust the seniority of the 570 as a result of ALPA's increased leverage in negotiating the issue over the years. Plaintiffs have not established by a preponderance of the evidence that United colluded with ALPA in ALPA's breach of the duty of fair representation.

## II. Count II: Against United and ALPA for Breach of Duty to Maintain Agreements and Settle Disputes

12. Section 2 of the RLA imposes a duty on carriers and their employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes...." 45 U.S.C. § 152, First.

13. Plaintiffs claim that in negotiating away plaintiffs' seniority positions, United breached its individual employment agreements with plaintiffs and thus United breached its duty to maintain agreements under the RLA. This claim lacks merit for two reasons. First, the duty to maintain agreements under the RLA applies only to "disputes between business organizations and labor unions that arise out of a collective bargaining agreement." *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1022 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1319, 108 L.Ed.2d 495 (1990), citing *Hendricks v. Airline Pilots Ass'n. Int'l*, 696 F.2d 673 (9th Cir.1983). This provision of the RLA applies to collective bargaining agreements, not individual employment agreements. *Id. See also Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 575, 91 S.Ct. 1731, 1734, 29 L.Ed.2d 187 (1971) (supporting the view that RLA § 2, First, requires a carrier to "make and maintain agreements with the *union*") (emphasis added).

14. Second, as discussed below, plaintiffs' individual agreements do not promise them seniority ahead of the 570. Thus, even if the duty to make and maintain agreements did apply to individual agreements, United has not breached that duty by agreeing to place the seniority of the 570 ahead of plaintiffs.

15. Plaintiffs also claim that ALPA, in continuously pressuring United to adjust the seniority of the 570 after it had been settled by the 1987 letter agreement, breached its duty to "settle all disputes" under 45 U.S.C. § 152, First. Again, this provision of the RLA governs disputes between the union and the carrier, not between the union and the employees it represents. *Herring*, 894 F.2d at 1022 (pilots could not recover against Delta Airlines and ALPA under § 152, First "because th[e] case presents no dispute between Delta and ALPA").

16. In sum, plaintiffs fail to state a claim for relief under this section of the RLA.

## III. Count III: Against United for Unlawful Discrimination

17. The RLA makes it unlawful for a carrier "to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization...." 45 U.S.C. § 152, Fourth. Plaintiffs claim that in agreeing to ALPA's proposal, United unlawfully discriminated against plaintiffs on the basis of union membership.

18. The evidence clearly demonstrates that 270 of the group of 539 are currently ALPA members. Plaintiffs failed to establish by a preponderance of the evidence that the challenged seniority provision distinguishes between union pilots and non-union pilots. Judgment is entered in favor of United and against plaintiffs on Count III.

## IV. Count IV: Against United and ALPA for Breach of Duty to Give Notice of Intended Change

19. The RLA requires that "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions...." 45 U.S.C. § 156. Plaintiffs seek to hold ALPA and United liable under this provision for failing to serve written notice on plaintiffs of the proposed

changes in seniority in the new collective bargaining agreement. However, the only parties entitled to notice under this provision of the RLA are the bargaining representative and the carrier. Plaintiffs do not have a right to notice under 45 U.S.C. § 156. *McMullans v. Kansas, Oklahoma and Gulf Ry. Co.*, 229 F.2d 50, 56 (10th Cir.), *cert. denied*, 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956); *Napier v. System Fed'n No. 91*, 127 F.Supp. 874, 890 (W.D.Ky.1955). Plaintiffs offer no authority to support their right to enforce this notice provision of the RLA. Accordingly, plaintiffs fail to state a claim in Count IV.

## V. Count V: Against United for Breach of Contract

20. Plaintiffs claim that they were guaranteed seniority ahead of the 570 in their individual employment agreements with United. However, the evidence demonstrates that guaranteed relative seniority was not a provision of the individual employment agreements signed by plaintiffs.

21. Plaintiffs argue that United orally promised that they would enjoy seniority ahead of the 570, and that these oral promises are enforceable. For several reasons, the court does not agree. First, plaintiffs have not shown that all 103 fleet qualified pilots were promised guaranteed relative seniority. At most, the evidence demonstrates that four of the 103 plaintiffs—Richard Lussow, George Spillman, Ralph Pate and Lee Rakestraw—reported to work and were told that the 570 had not shown up on May 17, 1985 and therefore would never be United employees. Thus, 99 plaintiffs have not met their burden of demonstrating that United made these oral promises.

■ 22. Even assuming the existence of evidence that all 103 plaintiffs received such oral statements, United's statements do not constitute enforceable promises. It is clear that when plaintiffs came to work, both United and plaintiffs *assumed* that the 570 would never become United employees and that they therefore would never have seniority above plaintiffs. Indeed, this assumption remained a reality until

Judge Bua ordered United to hire the 570. However, an assumption is not a contractual promise. United told the 570 that they would receive hiring date seniority, and indeed plaintiffs' seniority numbers are based on their hiring dates. United never promised the fleet qualified pilots that they would be guaranteed seniority ahead of the 570, because United did not believe that the 570 would return to work. United was careful to limit its employment offer for fleet qualified pilots to two promises: (1) guaranteed salary, and (2) permanent employment. The evidence does not support the conclusion that United promised plaintiffs guaranteed seniority ahead of the 570 as part of the individual employment contracts.

23. In light of this conclusion, the court need not consider United's argument that the alleged individual seniority contracts would violate the RLA and would therefore be unenforceable.

## VI. Count VI: Against ALPA for Tortious Interference with Contract

■ 24. As a result of ALPA's conduct in pressing the seniority issue with United in collective bargaining negotiations, plaintiffs charge ALPA with tortious interference with plaintiffs' individual employment agreements. In order to recover for tortious interference with contractual relations, plaintiffs must prove:

(1) The existence of a valid and enforceable contract,

(2) The defendant's knowledge of the existing contract,

(3) Intentional and malicious inducement of the breach,

(4) The subsequent breach by the third person due to defendant's wrongful conduct, and

(5) Damage to the plaintiff[s].

*Cross v. American Country Ins. Co.*, 875 F.2d 625, 627 (7th Cir.1989), quoting *Zamouski v. Gerrard*, 1 Ill.App.3d 890, 275 N.E.2d 429, 433 (1971).

25. Plaintiffs' claim is based on the existence of individual employment agreements between United and plaintiffs in

which United promised plaintiffs seniority ahead of the 570. As explained in the foregoing discussion, plaintiffs have failed to prove the existence of contractual promises regarding seniority. Accordingly, plaintiffs' claim for tortious interference fails.

26. In any event, plaintiffs' claim against ALPA for breach of the duty of fair representation fully encompasses plaintiffs' state law claim for tortious interference with contract. Thus, plaintiffs' claim for tortious interference with contractual relations is preempted by the RLA. *See Peterson v. Air Line Pilots Ass'n, Int'l,* 759 F.2d 1161, 1170-71 (4th Cir.) (where state claim of tortious interference with contract is "essentially identical to the duty of fair representation claim, . . . the potential conflict between remedies and administration [of federal and state law] are too great to permit the state claims to stand"), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). *Accord, Johnson v. United Food & Commercial Workers,* 828 F.2d 961, 967 (3d Cir.1987).

27. In short, plaintiffs' sole remedy against ALPA for its conduct in renegotiating the seniority rights of the 570 is a claim for breach of the duty of fair representation. Judgment is entered in favor of ALPA and against plaintiffs on Count VI.

## VII. Count VII Against United and ALPA for Breach of Third Party Beneficiary Rights

28. Plaintiffs claim that they are common law third party beneficiaries of the provisions in the 1987 letter agreement restricting future negotiations over the 570 issue.[15] According to plaintiffs, United and ALPA breached this agreement by renegotiating the seniority status of the 570.

29. United and ALPA contend that the court lacks jurisdiction over this claim because the 1987 letter agreement is the product of collective bargaining between ALPA and United. In order to assess the merits of plaintiffs' third party beneficiary claim, the court would be required to inter-

pret the collective bargaining agreement to determine whether plaintiffs actually were intended third party beneficiaries. ALPA and United point out that under the RLA, all claims involving the interpretation or application of collective bargaining agreements constitute "minor disputes" falling within the exclusive jurisdiction of the System Board of Adjustment, the parties' arbitration panel. 45 U.S.C. § 184; *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 303-04 and n. 4, 109 S.Ct. 2477, 2480-81 and n. 4, 105 L.Ed.2d 250 (1989); *National Ry. Labor Conference v. International Ass'n of Machinists,* 830 F.2d 741, 745 (7th Cir.1987) (interpretation of an existing contract is a minor dispute that must be referred to binding arbitration). *Accord, Chicago and Northwestern Transp. v. Local Union No. 214,* 829 F.2d 1424, 1427 (7th Cir.1987). Thus, defendants argue that the court lacks jurisdiction to decide plaintiffs' third party beneficiary claim.

30. Although plaintiffs' claim is properly characterized as a minor dispute, this claim falls within an exception to the rule granting exclusive jurisdiction to the arbitration panel. This exception applies when:

> the employee has not only a dispute with the employer involving interpretation of the collective bargaining agreement, but also a claim against the union for breach of the union's duty of fair representation. In that situation, the employee may bring a "hybrid" action alleging claims against both the union and the employer [for breach of contract].

*Trial v. Atchison, Topeka & Santa Fe Ry. Co.,* 896 F.2d 120, 123 (5th Cir.1990), citing *Glover v. St. Louis–San Francisco Ry. Co.,* 393 U.S. 324, 328-29, 89 S.Ct. 548, 550-51, 21 L.Ed.2d 519 (1969). Because plaintiffs charge ALPA with breach of the duty of fair representation, the exception for "hybrid" actions applies to plaintiffs' claim of breach of third party beneficiary rights. This court may adjudicate the merits of plaintiffs' claim in Count VII.

---

**15.** Although the complaint alleges that plaintiffs are intended third party beneficiaries of the

1985 back to work agreement, plaintiffs have abandoned this claim in their briefs.

31. United and ALPA also argue that the RLA preempts any claim for breach of third party beneficiary rights. The court need not decide that issue, for even assuming plaintiffs' claim is not preempted by the RLA's duty of fair representation, plaintiffs have not demonstrated that they are intended third party beneficiaries of the 1987 collective bargaining agreement. Plaintiffs cannot point to any language in the agreement that demonstrates an intent by United or ALPA to create a promise enforceable by the fleet qualified pilots. Indeed, plaintiffs are not even mentioned in the document. It is clear that ALPA never intended to benefit plaintiffs by agreeing to place the 570 behind plaintiffs on the seniority list in the 1987 letter agreement. To the contrary, the overwhelming evidence shows that ALPA executed the agreement because it was the only way ALPA could prevent United from firing the 570. Thus, plaintiffs were not intended third party beneficiaries of ALPA's promise never again to raise the 570 issue.

32. Further, in the 1987 letter agreement, *ALPA promised United* that ALPA would never seek to reopen the 570 issue; there was no corresponding obligation on United's part. Thus, even assuming plaintiffs were third party beneficiaries of the 1987 letter agreement, United was not precluded from renegotiating the 570 issue. *See United Steel Workers v. Rawson,* —— U.S. ——, 110 S.Ct. 1904, 1913, 109 L.Ed.2d 362 (1990) (employees may not sue union to enforce promise made by employer in a collective bargaining agreement because "third party beneficiaries generally have no greater rights in a contract than does the promisee").

33. In sum, the court concludes that plaintiffs were not third party beneficiaries of the 1987 letter agreement. Thus, judgment is entered in favor of United and ALPA and against plaintiffs on Count VII.

VIII. Remedy

34. The RLA contemplates injunctive relief, as well as monetary damages where appropriate, for breach of a union's duty of fair representation in negotiating a discriminatory contract. *Steele,* 323 U.S. at 207, 65 S.Ct. at 234.

35. In Count I, plaintiffs seek to permanently enjoin United and ALPA from executing the seniority provision of the 1991 collective bargaining agreement that places the 570 and the class of 1985 ahead of plaintiffs on the seniority list.

36. Permanent injunctive relief is appropriate if: (1) plaintiffs have prevailed on the merits of their claim; (2) plaintiffs have no adequate remedy at law; (3) the balance of equities favors granting an injunction; (4) the public interest is served. *Scruggs v. Moellering,* 870 F.2d 376, 378 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 371, 107 L.Ed.2d 357 (1989); *National Organization for Women v. Operation Rescue,* 726 F.Supp. 1483, 1496 (E.D.Va.1989), *aff'd,* 914 F.2d 582 (4th Cir.1990) *cert. granted,* —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991); *Travellers Int'l AG v. Trans World Airlines, Inc.,* 722 F.Supp. 1087, 1096 (S.D.N.Y.1989).

37. Plaintiffs have satisfied the standards for a permanent injunction. Plaintiffs have prevailed on the merits of their claim that ALPA breached its duty of fair representation in negotiating the seniority provision of the 1991 collective bargaining agreement. The new seniority provision would clearly impose irreparable injury on plaintiffs. The value of the threatened loss of seniority benefits is speculative and is not conducive to remedy through the award of monetary damages. Thus, plaintiffs have no adequate remedy at law.

38. In addition, the balance of harms favors an injunction to preserve plaintiffs' current seniority rights. An injunction would not cause hardship on United or ALPA. While the injunction clearly prevents the 570 from attaining seniority ahead of plaintiffs, the court has concluded that the 570 may not achieve this seniority adjustment through ALPA's breach of the duty of fair representation. On the other hand, without injunctive relief, plaintiffs stand to lose immeasurable future employment benefits that they have been antici-

pating for four years based on their seniority positions established in the 1987 letter agreement between ALPA and United. Finally, an injunction would further the public policy embodied in the RLA of ensuring that a union fairly represents all members of the collective bargaining unit.

## CONCLUSION

Defendant Air Line Pilots Association, International breached its duty of fair representation to plaintiffs. Accordingly, judgment is entered on Count I in favor of plaintiffs and against defendant Air Line Pilots Association, International. A permanent injunction shall issue barring execution of the seniority provision of the 1991 collective bargaining agreement between defendants United Airlines and Air Line Pilots Association, International.

Judgment is entered in favor of Air Line Pilots Association, International and against plaintiffs on Counts II through VII. Judgment is entered in favor of defendant United Airlines, Inc. and against plaintiffs on all counts.