981 F.2d 1524
 142 L.R.R.M. (BNA) 2054, 61 USLW 2451,
124 Lab.Cas. P 10,511
 Lee RAKESTRAW, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
UNITED AIRLINES, INC., Defendant-Appellee,
v.
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,
Defendant-Appellant, Cross-Appellee.
David A. HAMMOND, et al., Plaintiffs-Appellants,
v.
AIR LINE PILOTS ASSOCIATION and Trans World Airlines, Inc.,
Defendants-Appellees.
 Nos. 91-2285, 91-2416, 91-2417, 91-2502, 91-2503, 91-2535
and 91-2957.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 24, 1992.
Decided Dec. 28, 1992.
 
 Thomas R. Meites, Michael M. Mulder (argued), Paul W. Mollica, Laurie A. Wardell, Meites, Frackman, Mulder & Burger, Chicago, IL, Walter H. Fleischer, DC, for plaintiff-appellees.
 Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, IL, Michael E. Abram (argued), in Nos. 91-2535 and 91-2285, Stephen Presser, Peter Herman, Tamir W. Rosenblum, Joseph J. Vitale, Cohen, Weiss & Simon, New York City, for Air Line Pilots Ass'n, Intern. in Nos. 91-2535, 91-2503, 91-2502, 91-2416 and 91-2285.
 Duane M. Kelley, Robert W. Tarun, Winston & Strawn, Chicago, IL, Michael E. Abram (argued), New York City, Cohen, Weiss & Simon, New York City, Robert A. Siegel (argued), Victoria D. Stratman, Tom A. Jerman, O'Melveny & Myers, Los Angeles, CA, for United Air Lines, Inc. in Nos. 91-2503 and 91-2416.
 Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, IL, Stephen Presser, Peter Herman, Tamir W. Rosenblum, Joseph J. Vitale, Cohen, Weiss & Simon, New York City for Air Line Pilots Association, Intern. in No. 91-2417.
 Duane M. Kelley, Robert W. Tarun, Winston & Strawn, Chicago, IL, Michael E. Abram (argued), Cohen, Weiss & Simon, New York City, Robert A. Siegel (argued), Tom A. Jerman, O'Melveny & Myers, Los Angeles, CA, for United Air Lines in Nos. 91-2417 and 91-2502.
 Eugene J. Schiltz, Kenneth Philip Ross, Robert F. Coleman (argued), Coleman & Associates, Chicago, IL, for David A. Hammond, Terry D. Atkins, Kenneth N. Baldwin, Gregory N. Dohin, K. Richard Kloeppel and H.M. Smith.
 Patricia J. Hruby, Thomas J. Piskorski (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Michael A. Katz, Trans World Airlines, Legal Dept., Mt. Kisco, NY, for Trans World Airlines, Inc.
 Irving M. Friedman, Michael B. Erp, Stanley Eisenstein, Katz, Friedman, Schur & Eagle, Chicago, IL, Stephen B. Moldof (argued), Michael L. Winston, Cohen, Weiss & Simon, New York City, for Air Line Pilots Ass'n, Intern. in No. 91-2957.
 Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Two cases present a common question: does a union's duty of fair representation under the Railway Labor Act block the union from adjusting seniority in a way known to favor some employees over others? Both of these cases arise out of trauma at an airline: in one case its acquisition by a larger carrier, and in the other a strike followed by the hiring of replacement pilots.
 
 
 2
 In each case the union (the Air Line Pilots Association, or ALPA) negotiated with management an agreement providing every pilot with seniority from the date of hire. In the first case, the pilots of the smaller carrier contend that they should have received bonus seniority or equivalent protection (such as denying TWA's pilots seniority credit for time on furlough) to offset the fact that dovetailing the seniority lists worked to the advantage of the larger carrier's pilots, who on average had longer service. In the second case, the pilots hired during the strike contend that another group of pilots should have received seniority from the day they went to work in the cockpit rather than the day they reported for training, in order to protect the positions that they assumed in the face of animosity from the striking pilots.
 
 
 3
 Judge Lindberg found in the first case that by melding the seniority lists without a bonus for the pilots from the smaller airline the union did not violate its duty of fair representation. Judge Conlon found in the second case that by creating a uniform rule of seniority for all pilots the union violated its duty to the replacements, who acquired vested rights in an earlier agreement. To obtain the seniority rule, the union had given $200 million in concessions to the carrier. The judge's ruling let the airline keep these concessions while restoring an earlier seniority table--one management strongly favored, as it rewarded pilots who had been loyal to it during the strike.
 
 
 4
 * We simplify the facts. Details are irrelevant on the view we take of the union's obligations. Interested persons may glean additional particulars from the district court's opinions, our own prior opinion in the second case, and an opinion of the Supreme Court of Colorado addressing some state-law issues that are not salient here. Hammond v. Air Line Pilots Ass'n, 141 L.R.R.M. 2063, 1991 WL 202638, 1991 U.S.Dist. LEXIS 13558 (N.D.Ill.); Rakestraw v. United Airlines, Inc., 765 F.Supp. 474 (N.D.Ill.1991). See also Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc., 802 F.2d 886 (7th Cir.1986); DeJean v. United Airlines, Inc., 839 P.2d 1153 (Colo.1992).
 
 
 5
 * In 1985 Trans World Airlines was in financial distress. Texas Air Corporation made overtures to acquire TWA. Terrified by the reputation that Texas Air's honcho Frank Lorenzo had acquired for slicing wages, TWA's unions made overtures of their own to other potential acquirers. Eventually the unions cut a deal with Carl Icahn, head of an investment group that acquired TWA. The pilots made sizable concessions, in exchange for which Icahn agreed not to reduce the size of the airline. This agreement, called the "wraparound agreement" because it wraps around the gap between old and new corporate shells, provides among other things that there shall be "no full or partial merger undertaken of the pilot seniority lists of the airline operated by TWA or New TWA ... and any such other [acquired airline] ... without prior consent of ALPA".
 
 
 6
 In 1986 TWA acquired the stock of Ozark Airlines. The pilots at TWA, having made concessions the prior year, wanted job security. They preferred having Ozark's pilots added at the end of TWA's seniority list, as if they had been hired on the date of the merger, but were willing to dovetail the seniority lists, giving each pilot seniority from the date hired by either airline. TWA was an old, shrinking carrier; the pilots still working there had long seniority, while Ozark, a growing regional carrier, had a younger labor force. A merger by date of hire would leave TWA's pilots with the pick of the assignments. The pilots at Ozark understood this. Seeing that melding the seniority list by date of hire would leave them near the bottom, the first to go if TWA continued shrinking, they demanded protection. One common bulwark is slots: for example, if TWA had three times as many pilots as Ozark, then the three most-senior pilots at TWA would be numbers 1 to 3 on the seniority list, the most senior pilot at Ozark would be number 4, positions 5-7 would go to TWA's pilots, position 8 to Ozark, and so on. That method would boost Ozark's senior pilots, hired during a period when TWA was laying off pilots, from puddle jumpers to 747s, and demote some of TWA's captains. Deadlock ensued. TWA's pilots would not yield more than merger by date of hire, and Ozark's pilots stood on their demand for protection.
 
 
 7
 ALPA has a merger policy providing for arbitration if the two carriers' pilots cannot agree how to merge seniority lists. On behalf of all pilots, ALPA then asks the employer to implement the arbitral award. Ozark's pilots demanded arbitration. Hank Duffy, the president of ALPA, deferred convening the arbitral panel, seeking to mediate the dispute. Meanwhile ALPA did not consent to merger of the seniority lists. TWA then announced that it would operate Ozark's planes with TWA's pilots. TWA wanted Ozark's assets--planes, gates, and landing slots--rather than its labor force. The wraparound agreement barred shrinkage at TWA but not a transfer of planes into TWA. Staring unemployment in the face, Ozark's pilots accepted a merger of the seniority lists by date of hire, approving the agreement by a vote of 329 to 35. Eventually Ozark's pilots got a slight bonus: ALPA convened an arbitral panel, which established seniority "cells" protecting Ozark's pilots from losing some of the positions they had in the cockpits of Ozark's former aircraft. TWA's pilots received some protective cells in exchange, and these too aggrieve Ozark's pilots. ALPA sought more shelter for Ozark's pilots by lobbying (Congress let the merger proceed) and asking federal regulators for terms that would protect Ozark's pilots as conditions of the acquisition (it lost, Air Line Pilots Ass'n, Int'l v. Department of Transportation, 838 F.2d 563, 567 (D.C.Cir.1988)).
 
 
 8
 In this litigation a class of Ozark's former pilots accuses ALPA of violating its duty of fair representation under the Railway Labor Act as well as committing offenses under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a). The pilots contend, too, that both ALPA and TWA dishonored their obligations under the wraparound agreement, which would violate the Railway Labor Act. 45 U.S.C. § 152 Seventh. Most of plaintiffs' claims emphasize ALPA's departure from its usual "merger policy" and Duffy's supposed toadying to the more numerous TWA pilots, who threatened to secede from ALPA unless they got their way.
 
 
 9
 After holding the case under advisement for 19 months, the district judge granted summary judgment to ALPA and TWA, adopting the defendants' briefs as his statement of reasons. Judges must give their own reasons and may not adopt parties' briefs. DiLeo v. Ernst & Young, 901 F.2d 624, 626 (7th Cir.1990). We remanded the case so that the judge could comply with Circuit Rule 50. The court promptly issued a new opinion explaining that dovetailing is a non-arbitrary objective for a union, that there is no evidence that ALPA's leaders had it in for the Ozark pilots, and that the Ozark pilots' vote undercut most of their remaining contentions. The court also concluded that the wraparound agreement creates rights in favor of TWA's pilots exclusively, even though it names ALPA as a whole; Ozark's pilots are not third-party beneficiaries.
 
 
 10
 Adversity has continued at TWA, which is now a debtor in bankruptcy. Seniority turned out to matter greatly. Many of Ozark's former pilots did not last long at TWA. The bankruptcy judge has lifted the automatic stay, permitting this appeal to proceed.
 
 B
 
 11
 United Airlines had hired no pilots since 1979 when, in 1984, it decided to expand its operations. It recruited would-be pilots for training during 1984-85. In a departure from practice, United did not hire them at the start of training but said that the hiring would be effective only when they reported for flight duty. United was negotiating a two-tier wage structure with its existing pilots and sought to hire the new group at the lower rate. Although the trainees were not on the payroll (United was paying their expenses only), they received tentative seniority numbers based on the date their training began.
 
 
 12
 Negotiations with ALPA did not go well. In April 1985 the National Mediation Board announced an impasse, remitting both sides to their own devices on May 17, 1985. The union called a strike for that date. United directed the trainees (570 of whom completed the program) to report for work on May 17 and proclaimed that anyone who did not do so would never work for United. Only 25 of the 570 reported on May 17; another 6 began to work in the ensuing days.
 
 
 13
 United also hired replacements for the striking pilots. The new "fleet qualified" pilots--that is, persons already certified by the FAA as able to fly the types of planes in United's fleet--were assured permanent employment at a premium wage. Although new pilots were to receive starting salaries of $22,500 per year under United's two-tier schedule, the carrier offered $75,000 to captains and $50,000 to first officers among the replacements. Relative seniority, United explained, would depend on when they started and what others did: the replacements would rank behind any of the Group of 570 who worked during the strike, and behind any pilots returning at the end of the strike. Before the strike began, United also told four of the replacements that few of the 570 were expected to report and that it did not plan to hire the others. This implied greater relative seniority for the replacements. Minimum salaries of $75,000 or $50,000 would continue, United promised, even if the replacements' low seniority pushed them back to the third seat in the cockpit. Lower seniority would knock the replacements out of the more desirable planes, positions in the cockpit, routes, and bases, even though they retained their salaries.
 
 
 14
 United hired 219 fleet qualified pilots, who have seniority dates between May 17 and June 28. During the strike United accepted another group of trainees. Three hundred twenty of these student pilots ultimately went to work, receiving seniority dates in July 1985 as they reported for flight. The 219 fleet qualified pilots and the 320 student pilots have become known as the Group of 539.
 
 
 15
 The strike ended on June 15, 1985, without a new collective bargaining agreement. The striking pilots returned to work with their original seniority. Members of the Group of 570 who reported during the strike and the 219 fleet qualified replacements retained their positions; the 320 student pilots began work in due course. ALPA and United agreed to disagree about the fate of those in the Group of 570 who had not worked during the strike. United insisted that it would never employ them, and ALPA that this was illegal discrimination on account of concerted activity (that is, honoring the picket lines).
 
 
 16
 On behalf of the Group of 570, ALPA initiated litigation. Judge Bua directed United to hire any members of this group (called the Group of 500 in that litigation) who still wanted work, with seniority from May 17 (ahead of most of the Group of 539). Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc., 614 F.Supp. 1020, 616 F.Supp. 849 (N.D.Ill.1985). United put these trainees on a preferential hire list, and many of them began to work. Our decision the next year, 802 F.2d 886, concluded that the Group of 570 was not protected by the Railway Labor Act after all. That statute applies only to "employees," and members of the Group of 570 did not become employees until they reported for assignments as pilots. 802 F.2d at 910-17. Other parts of the opinion held that the guaranteed salaries for the fleet qualified pilots did not violate the Act, id. at 907-10, but that some of United's position bidding practices were illegally discriminatory, id. at 898-901.
 
 
 17
 United threatened to fire those of the Group of 570 who had been hired by virtue of the injunction. Under the Railway Labor Act, the pilots could not threaten a strike in response. With no leverage at the bargaining table, ALPA took the best offer United was willing to make: it would retain strikers from the Group of 570 with a seniority date of November 9, 1985. (November 9 was the date of the preferential hire list required by the district judge's injunction.) ALPA promised that "it will never seek to challenge [United's] action ... in court or before an arbitrator, nor will it seek to raise the issue of the 'Group of 570' relative seniority position as part of any future negotiations ... regarding any subject whatsoever." Every working member of the Group of 570 signed a document releasing both United and ALPA from all liability. (The Supreme Court of Colorado has held that the releases are valid.)
 
 
 18
 United was happy, because pilots who had sided with management during the strike became senior to the members of the Group of 570 who honored the picket lines. Other pilots were dismayed that the replacements were to receive not only premium salaries but also plum bases, routes, and positions in the cockpit. ALPA's leaders promised guerrilla warfare against the fleet qualified replacement pilots, and, if need be to get the 219 replacements, against the entire Group of 539, even though the 320 student pilots had not crossed the picket lines. The 219 were harassed in and out of the cockpits--with the active and thoroughly illegal support of ALPA's leadership, the district judge found.
 
 
 19
 Rancor among the pilots and the lack of a collective bargaining agreement drove ALPA and United back to the table. Management came around to the view that efficient operation of the airline required peace with ALPA, and that the price of peace was to reverse the seniority positions of the Groups of 570 and 539. Knowing that the union dearly wanted this reversal, United held out for concessions. In April 1991 labor and management signed a new collective bargaining agreement. In exchange for concessions worth $200 million, ALPA obtained the seniority dates it preferred. All working members of the Group of 570 obtained seniority dates of May 17, 1985, with priority among themselves according to the first date of training. Because United hired no pilots between 1979 and May 17, 1985, this effectively gave the Group of 570 seniority as of the first date of training, which had been United's traditional practice.
 
 
 20
 Although the fleet qualified replacements kept their salaries, many lost routes, bases, aircraft, and positions in the cockpit they preferred. Instead of giving orders to members of the Group of 570, they were taking orders from them. One hundred three of the fleet qualified replacements filed this suit, contending that ALPA violated its duty of fair representation, that both union and management violated the promise made in the settlement of 1987, and that United broke the promises made to them in 1985.
 
 
 21
 The district court consolidated a request for a preliminary injunction with the trial of the merits. Judge Conlon ruled in defendants' favor on all claims but one: the duty of fair representation. After finding that "ALPA has nurtured a six-year vendetta against the 539 and the fleet qualified pilots in particular", 765 F.Supp. at 491, the court held that ALPA "unfairly abrogated the legitimately-negotiated seniority status that plaintiffs have relied upon for four years." Id. at 493. The court continued:
 
 
 22
 Overwhelming evidence demonstrates that ALPA bitterly opposed the very existence of fleet qualified pilots. Plaintiffs have therefore proven by a preponderance of the evidence that in negotiating the 1991 collective bargaining agreement, ALPA unfairly discriminated against the 539, and the fleet qualified pilots in particular.
 
 
 23
 It is of no consequence that there is a rational basis for granting the 570 ... seniority as of May 17, 1985.... [T]he seniority of the 570 ... could be logically determined in a number of ways. However, ALPA and United had previously negotiated the 1987 letter agreement as a permanent solution to the dispute over the 570's seniority.... ALPA has acted in bad faith in negotiating to reverse the relative seniority rights of the 539 in the 1991 collective bargaining agreement.
 
 
 24
 Ibid. (paragraph numbers and footnote omitted). In other words, once union and management settle a dispute about seniority, the union's duty of fair representation prevents reopening the issue--for the only outcome is to prefer one group of employees over another in a zero-sum game.
 
 II
 
 25
 Negotiation means compromise. Neither employees as a whole nor particular groups of employees emerge from bargaining with all their wants satisfied. Often unions can achieve more for some of their constituents only by accepting less for others. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). See also Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964). It is the "subject always" reservation--coupled with the proposition that "[t]he bargaining representative ... owes complete loyalty to the interests of all whom it represents", 345 U.S. at 338, 73 S.Ct. at 686 (emphasis added), "without hostility to any", id. at 337, 73 S.Ct. at 686--that sets the stage for the disputes in our two cases. What is "good faith and honesty of purpose" when a union sacrifices the achievement of some employees' wishes in order to obtain more for other employees?
 
 
 26
 Some years after Huffman, the Court concluded that a union breaches its duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith". Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Until ALPA v. O'Neill, --- U.S. ----, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), inferior courts debated whether this standard applies to the negotiation of a collective bargaining agreement as well as to the administration of that agreement; O'Neill holds that it does. There remains the problem of identifying "arbitrary, discriminatory, or ... bad faith" conduct. These terms are not self-defining. They are conclusions--epithets rather than standards of conduct or tools of analysis. When are these labels appropriate? We know from Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 798-800 (7th Cir.1976), that a union may not take away the seniority of some employees for no reason other than that the losers have too few votes to affect the outcome of an intra-union election, or that they opposed the union's leadership, and from Bennett v. Glass Workers Local 66, 958 F.2d 1429, 1436-39 (7th Cir.1992), that a union may not sell an employee down the river for no reason at all, or for a reason forbidden on substantive grounds, such as race or internal union politics. See also, e.g., Camacho v. Ritz Carlton Water Tower, 786 F.2d 242 (7th Cir.1986). Thus a union may not disfavor those among its members who voted against its officers in the last election, or employees in the bargaining unit who refuse to join the union (unless there is a valid union security clause). Employees have a statutory right to choose to be represented by unions, or freely to oppose unions. Just as the employer may not penalize collective action by the workers, so the organized workers may not penalize those who prefer individual to collective decision-making.
 
 
 27
 A conclusion that a union may not neglect or penalize dissidents pushes the problem to a different plane of generality. What is a forbidden penalty? Ozark's pilots insist that they were "penalized" during the merger of seniority lists because they were not numerous enough to influence ALPA's leaders; the union replies that all pilots were treated equally. The fleet qualified pilots at United insist that they were penalized for replacing striking workers; the union replies that all pilots now have seniority from the beginning of their time (whether training or flight) with the airline, and that at all events the union is entitled to offset the preferences, such as the extra salary, the employer has provided to a favored group of employees. The same acts may be characterized as "bad faith" efforts to take a perquisite away from one group, or as normal efforts to provide a level playing field for all workers. Slogans can be mustered on all sides.
 
 
 28
 So we are back to the beginning. Bargaining has winners and losers. See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); Thomas v. United Parcel Service, Inc., 890 F.2d 909, 917 (7th Cir.1989); Merk v. Jewel Companies, Inc., 848 F.2d 761, 764-65 (7th Cir.1988); Alvey v. General Electric Co., 622 F.2d 1279, 1287-90 (7th Cir.1980). A better retirement plan and other deferred compensation helps older workers at the expense of younger ones, who prefer cash to cover current expenses. Accepting lower fringe benefits (less health insurance, fewer days off) in exchange for higher cash wages helps the majority at the expense of the sick and those whose religious faith requires them to take extra days off. Higher wages assist those who remain with the firm at the expense of workers who may be laid off when the employer loses business to its competitors. Reducing the difference between the wages of skilled and unskilled workers assists the less skilled, who also tend to be more numerous. Unless its leaders are unfathomably dense, the union knows who wins and who loses. The losers always may say that the union "intended" them to lose. As all of society is an assembly of minorities, the losers can point to some respect (age, sex, religion, politics, skill, health, membership in the union, status during the most recent strike) in which they are in a minority, and insist that the distinction must have been part of a "bad faith" plot to "penalize" them on account of that status. Taken to its limits, the approach prevents the union from resolving differences internally and representing the interests of workers as a group. Yet one of the premises of the Railway Labor Act (like the National Labor Relations Act), and a requirement of the Labor-Management Reporting and Disclosure Act, is that unions act democratically to reach a collective decision--the majority is entitled to prevail. Humphrey, 375 U.S. at 349-50, 84 S.Ct. at 372; Steele v. Louisville & Nashville R.R., 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944).
 
 
 29
 Huffman and O'Neill show that a conflict among workers does not undercut the union's ability to choose. The union representing Ford's employees negotiated a collective bargaining agreement that counted military service as time with the firm for purposes of seniority, whether or not the worker had been employed by Ford before his military service. This meant that people arriving fresh from the military would leap over some persons who had been at Ford for years. The Court thought this collective bargaining agreement reasonable, even though it contained a further provision giving special protection to union officials. Huffman, 345 U.S. at 339, 342, 73 S.Ct. at 687, 688. In O'Neill the union settled a strike by agreeing to a seniority table that favored replacement employees but secured some slots for the returning strikers. The Court concluded that this agreement was not arbitrary, because it reduced the risk that the returning strikers would get nothing. --- U.S. at ----, 111 S.Ct. at 1136.
 
 
 30
 After O'Neill, is the union safe when throwing in the towel but not when fighting for the strikers? Plaintiffs in O'Neill were striking pilots who believed that the union had given too much away in the back-to-work agreement. Unions rarely face charges of being too cozy with management, and the pilots' union has a reputation for being particularly tough. (These cases involve the same union as O'Neill, which operates without traditional locals.) O'Neill tells us that surrender is OK if the union gets the table scraps and, most likely, even if it does not. When battling fiercely for labor, a union is more likely to encounter a charge of "bad faith"--that it set out to injure those who, by working during a strike, assisted management. If the union as "bargaining representative ... owes complete loyalty to the interests of all whom it represents", Huffman, 345 U.S. at 338, 73 S.Ct. at 686, "without hostility to any", id. at 337, 73 S.Ct. at 686, does it not follow that the union owes "complete loyalty" to the strike breakers? It represents everyone in the bargaining unit, after all. Yet the weapons of economic warfare usually are matched. Unions may go on strike, managers initiate lockouts. Unions picket, managers hire replacements. NLRB v. MacKay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938). If managers may tempt replacements with premium wages and super-seniority, see Trans World Airlines, Inc. v. Flight Attendants, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); Giddings & Lewis, Inc. v. NLRB, 675 F.2d 926, 930-31 (7th Cir.1982), may the union not try to take these favors away?
 
 
 31
 Unions commonly demand that "permanent" replacements give way to the returning strikers, and that inducements dangled before these workers be snatched back if they remain employed. Cf. Aqua-Chem, Inc. v. NLRB, 910 F.2d 1487 (7th Cir.1990), rehearing denied, 922 F.2d 403 (1991). Does this violate the union's duty to represent its enemies fairly? Must the union, perhaps, advance the interests of the replacements, at the expense of the strikers, once they achieve a majority in the bargaining unit? Premium wages and the like do not violate the labor laws--which provide that employers cannot discriminate against those who engage in concerted action--if we consider the high wages rewards for work, rather than treating normal wages as penalties for rallying 'round the union's standard. Then it follows that efforts by the union to turn the tables also are not "penalties" for taking sides in the strike, or otherwise evidence of forbidden motive. In O'Neill the Court assumed that a union may try to reward the faithful (or at least restore parity) after the strike. Plaintiffs' theory in O'Neill was that ALPA had not done "enough" to protect the strikers at the expense of the replacements. Instead of replying that a union is not entitled to do anything to advance workers who respect picket lines over those who cross them, the Court explained that the union's decision about how much protection of the strikers is "enough" should be respected unless arbitrary or in bad faith. That must entail the conclusion that the effort to aid one group at the expense of another is not itself arbitrary or in bad faith.
 
 
 32
 Buzzwords such as "bad faith" and "arbitrary" being empty, O'Neill analogized the union's choice to that of a legislature, subject to the most deferential judicial review. No one would pretend that cases interpreting the equal protection clause of the fourteenth amendment, which the Court summoned up, --- U.S. at ----, 111 S.Ct. at 1135-36, are an integrated whole. But they do give illustrations of both method and result. A legislature may prefer dairy farmers over consumers, Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), optometrists over opticians, Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and long-time homeowners over newcomers, Nordlinger v. Hahn, --- U.S. ----, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), provided only that a rational person might believe that these distinctions serve the interest of the polity as a whole. Cf. McCann v. Chicago, 968 F.2d 635 (7th Cir.1992). Slapping the label "bad faith" or "discrimination" on a classification that is rationally related to a legitimate objective does not alter the analysis. A discriminatory motive without a discriminatory rule does not condemn a statute. Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); cf. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (rule rationally related to legitimate objective not spoiled by religious motivation of some sponsors). Knowledge that some groups gain or lose as a result of a rule does not even amount to a discriminatory motive. Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).
 
 
 33
 Unions legitimately may try to advance the interests of labor at the expense of investors and consumers. Success in this endeavor requires concerted action. That is to say, unions have been authorized to use the tools of cartels, and success depends on concerted action, including dealing with "cheaters." Whatever undercuts concert among labor reduces the effective wage unions can secure. Managers try to undermine labor's position by divide-and-conquer tactics: by individual negotiations, by favors for their friends. To say that the union acts in "bad faith" or "discriminatorily" when it attempts to shore up the solidarity of labor by eliminating the distinctions managers try to introduce is to curb an important tool by invoking a slogan. There are limits on what labor can do in response to management. Unions may not shoot strike-breakers, and we may assume that they may not negotiate for wage scales the mirror image of managers' preferred systems (that is, a collective bargaining agreement may not provide that workers who respected the picket line, or joined the union, receive a premium over others). Beyond these limits, workers generally may decide by majority vote where their interests lie.
 
 III
 
 34
 A rational person could conclude that dovetailing seniority lists in a merger, treating service at either firm as of equal weight, without quotas or other preferences for either group of employees, serves the interests of labor as a whole. Seniority lists sometimes are endtailed. That is, the employees of the smaller firm are given seniority only from the date of the acquisition, effectively added at the end of the larger firm's seniority roster. Contentions that endtailing violates the union's duty have been unsuccessful. Frandsen v. Railway Clerks, 782 F.2d 674 (7th Cir.1986); Schick v. NLRB, 409 F.2d 395 (7th Cir.1969). The propriety of dovetailing, treating the two groups identically, follows directly. If the union's leaders took account of the fact that the workers at the larger firm preferred this outcome, so what? Majority rule is the norm. Equal treatment does not become forbidden because the majority prefers equality, even if formal equality bears more harshly on the minority. Cf. Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). These principles dispose of the Ozark-TWA case.
 
 
 35
 The former Ozark pilots emphasize that ALPA did not follow the "merger policy" it developed to ensure both equal treatment and solidarity. For the sake of assessing their argument, we assume that the belated reference to arbitration means that ALPA did not "follow" its "merger policy." Adhering to this policy insulates the union against a charge that advocating the arbitrators' award in negotiations with the employer violates the duty of fair representation. Air Wisconsin Pilots Protection Committee v. Sanderson, 909 F.2d 213, 216-17 (7th Cir.1990). It does not follow that deviation exposes the union to liability. Policies do not spring to life fully grown, as from the brow of Zeus. Like the common law, ALPA's "merger policy" is the result of evolution, of experimentation and change when circumstances warrant. It did not become frozen in 1986, all modification taboo.
 
 
 36
 Union officials hoped to bridge the gap between Ozark's and TWA's pilots without litigation--and arbitration is a form of litigation. Cramming the "merger policy" down the throats of an unwilling cadre at TWA could have been calamitous for Ozark's pilots, because TWA held all the cards. It was free under the wraparound agreement to acquire Ozark's planes and put TWA's pilots to work in their cockpits. TWA's pilots would have been delighted. The union's agreement was needed only for a formal merger of seniority lists; TWA demonstrated both ability and willingness to conduct the transaction as an asset acquisition, leaving the shell of Ozark as a subsidiary. TWA did not need Ozark's pilots and was hardly likely to offend its own pilots by arranging the transaction in a way that favored Ozark's. ALPA's "merger policy" could not compel TWA to agree to anything, and it did not seem likely, under the circumstances, to produce agreement within the union either. So ALPA experimented, emphasizing negotiations between representatives of the two groups rather than what Duffy feared would be premature intra-union litigation. Perhaps Duffy was wrong, but a mistake in judgment does not violate the duty of fair representation.
 
 
 37
 All of the Ozark pilots' remaining contentions, variously expressed in terms of the Railway Labor Act, the LMRDA, and the wraparound agreement, founder on their own vote in favor of the merger and the ensuing new collective bargaining agreement. ALPA did not give the consent required by the wraparound agreement until Ozark's pilots voted in favor of the merger with dovetailed seniority lists. (Because Duffy's consent on behalf of ALPA satisfied the conditions of the wraparound agreement, it is unnecessary to decide whether the union as a whole, or only TWA's pilots, possesses entitlements under it.) According to Ozark's pilots, we should disregard their approval because it was given under duress: TWA had transferred four planes to itself, furloughed 86 Ozark pilots, and was threatening to move the rest of the fleet in the same way. Straightened circumstances these were, but a decision to make the best of a poor position does not vitiate a choice. Henn v. National Geographic Society, 819 F.2d 824 (7th Cir.1987). TWA, not the union, was applying the screws. TWA had every right to use economic pressure. To treat the pilots' response as voidable, making their vote a one-way street in which they could reap any benefit but would surrender nothing, would ensure that employers paid no heed to unions' promises in the future. A group disabled from making binding concessions cannot expect anything in return. One of the principal objectives of labor law is peaceful, which is to say contractual, resolution of differences. When one side may abandon its promises by pleading hard circumstances, the institution of contract and all its benefits are imperiled.
 
 
 38
 The Ozark pilots' reformulation of their contention as a challenge to their "exclusion" from the TWA pilots' voting on the new collective bargaining agreement is puzzling. At the time TWA's pilots voted, Ozark's pilots were insisting that they had a binding agreement with Ozark and did not want to vote on another. You can't complain that you were "excluded" from an election you boycotted! Had every Ozark pilot voted "no," the TWA pilots' affirmative votes would have carried the day. Setting aside a foredoomed outcome because of irregularities in the voting cannot be justified. Cf. Virginia Bankshares, Inc. v. Sandberg, --- U.S. ----, ----, 111 S.Ct. 2749, 2761-66, 115 L.Ed.2d 929 (1991). A wrong is actionable only when it causes injury; here the TWA pilots' support for the agreement, rather than any legal wrong done to the Ozark pilots, is a sufficient cause of the final collective bargaining agreement. But, as we have said, no wrong was done. Ozark's pilots eventually stopped sulking, voted, and approved the pact. A voluntary choice may not be withdrawn because the choice was an effort to make the best of a bad situation. Adult pilots, of sound mind and well aware of the consequences of their acts, must expect to keep their contracts, even when they wish they could have made better deals.
 
 IV
 
 39
 ALPA's leadership, like many of United's pilots, detested the strike-breakers and wanted revenge, by means fair or foul. This loathing played a role in the union's efforts to increase the seniority of the Group of 570, which would demote the fleet qualified pilots. Giving the Group of 570 seniority from May 17, 1985, also demoted the 320 trainees, none of whom crossed the picket lines and many of whom have joined the union, but the district judge's findings of fact--none of which is clearly erroneous--establish that the union was willing to pay this price to get back at the reviled 219 replacement pilots.
 
 
 40
 The district court believed that a retaliatory motive rendered it "of no consequence that there is a rational basis for granting the 570 ... seniority as of May 17, 1985." 765 F.Supp. at 493. Even on the assumption that a bad motive spoils an agreement rationally serving the interests of labor as a whole, the district court's conclusion does not necessarily follow. ALPA had mixed motives. It wanted to harm the replacements, but it also wanted to restore the normal seniority arrangements at United--the arrangements that had been in place for many years before United started training the Group of 570, that were part of the union's proposals before the strike, and that United honored in part when assigning the trainees tentative seniority numbers based on the dates they began training. Would the union have held out for giving the Group of 570 seniority as of May 17 had there been no replacement pilots, leaving the 320 trainees the only losers? If yes, then it is hard to chalk up the seniority arrangement to a bad motive. See NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Cf. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 285-87, 97 S.Ct. 568, 575-76, 50 L.Ed.2d 471 (1977). The district judge did not discuss the dual-motive problem.
 
 
 41
 For the reasons developed in Part II of this opinion, however, a "bad" motive does not spoil a collective bargaining agreement that rationally serves the interests of workers as a whole, and that treats employees who are pariahs in the union's eyes no worse than it treats similarly situated supporters of the union. The 219 fleet qualified pilots fared no worse than the 320 trainees, and both the 570 and the 539 received seniority slots that would have been forthcoming under United's pre-strike practices. Plaintiffs all but concede that United and ALPA could have agreed in their back-to-work agreement that all members of the Group of 570 employed by United would receive seniority as of May 17 (with priority among themselves according to their first date of training), and that union and management could have reached the same settlement in 1987, after we reversed Judge Bua's injunction. See TWA v. Flight Attendants, 489 U.S. at 435-37, 109 S.Ct. at 1231-32; Belknap, Inc. v. Hale, 463 U.S. 491, 513-14, 103 S.Ct. 3172, 3185, 77 L.Ed.2d 798 (1983) (Blackmun, J., concurring). Hostility is common in strikes, especially when some people cross the picket lines. Solutions often involve adjusting the positions of those who did and did not work during the strike. To say that antipathy toward the strike-breakers forbids the union from advocating the cause of its adherents would make the settlement of strikes much harder. The Norris-LaGuardia Act put the federal courts out of the business of protecting employers and strike-breakers against unions. Nonetheless, plaintiffs submit, everything changed when ALPA capitulated in 1987. Thereafter they had vested rights, which the union could no more change than it could invade their bank accounts to finance its operations.
 
 
 42
 Once a seniority system is in place, many employees come to think of their position in the pecking order as a form of property. Higher seniority means more desirable assignments and greater security of employment. Preventing jolts to these expectations is an objective the legal system shares with the parties. E.g., Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 912, 109 S.Ct. 2261, 2269, 104 L.Ed.2d 961 (1989). Yet seniority does not "belong" to an employee, any more than he "owns" the prospect of receiving a given wage next year or flying the St. Louis-Paris route rather than the leg from Minneapolis to Duluth. Seniority is a creation of collective bargaining agreements and equivalent contracts between unions and employers. When these expire, employers are free to use other criteria, such as merit, to assign jobs and decide who will be let go in hard times. Like wages and fringe benefits, seniority is a legitimate subject of discussion and compromise in collective bargaining. Schick v. NLRB, 409 F.2d 395, 398 (7th Cir.1969); Food Workers Local 7 v. Gold Star Sausage Co., 897 F.2d 1022, 1026 (10th Cir.1990).
 
 
 43
 Barton Brands holds that a union may not juggle the seniority roster for no reason other than to advance one group of employees over another. The change must rationally promote the aggregate welfare of employees in the bargaining unit. 529 F.2d at 800. ALPA had at least two rational and appropriate objectives from this perspective: (1) to reduce the advantages enjoyed by the replacements, and thus to strengthen the hand of organized labor in future conflicts with management, and (2) to restore the seniority system that United had long used. The first shores up the monopolistic quality of organized labor. The second recognizes that stability is itself a legitimate objective, for the reasons given in Nordlinger and McCann. Management also had legitimate reasons to agree to the request: labor gave concessions worth $200 million, and the alteration of the seniority tables reduced (although it could not eliminate) the friction among pilots that was hampering operations.
 
 
 44
 ALPA's promise in 1987 that "it will never seek to challenge [United's] action ... in court or before an arbitrator, nor will it seek to raise the issue of the 'Group of 570' relative seniority position as part of any future negotiations ... regarding any subject whatsoever" may create contractual rights, but it does not change the elements of the union's duty of fair representation. And it does not create contractual rights enforceable in court by the Group of 539. Parties to an agreement--only ALPA and United signed this one--may change their minds and negotiate anew. If the 1987 agreement creates rights that the Group of 539 may enforce as third-party beneficiaries, the parties' disagreement is a "minor dispute" that must be submitted to an arbitral panel under the Railway Labor Act. 45 U.S.C. § 184. We need not decide whether this is appropriate, because the Group of 539 has spurned the procedures under the Railway Labor Act. As for the future: ongoing accommodation is a hallmark of labor relations. Consolidated Rail Corp. v. Railway Labor Executives' Association, 491 U.S. 299, 308-09, 109 S.Ct. 2477, 2483, 105 L.Ed.2d 250 (1989); Transportation-Communication Employees v. Union Pacific R.R., 385 U.S. 157, 160-61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-81, 80 S.Ct. 1347, 1351-52, 4 L.Ed.2d 1409 (1960); McKinney v. Missouri-Kansas-Texas R.R., 357 U.S. 265, 273-74, 78 S.Ct. 1222, 1227, 2 L.Ed.2d 1305 (1958). "Forever" in labor relations means "until the next collective bargaining agreement." Excepting vested rights, a promise lasts only until renegotiation or the expiration of the agreement. Litton Financial Printing Division v. NLRB, --- U.S. ----, ----, 111 S.Ct. 2215, 2226, 115 L.Ed.2d 177 (1991).
 
 
 45
 Pledges of the sort ALPA made in 1987 do have one important effect: they remove the topic as a mandatory subject of collective bargaining. Battle v. Clark Equipment Co., 579 F.2d 1338, 1347 (7th Cir.1978). United could wave off any effort by the union to negotiate concerning the Group of 570's seniority position. Parties may not negotiate to impasse over a topic that is a permissive rather than a mandatory subject of collective bargaining, and in consequence failure to reach agreement may not be the basis of a strike or lockout. In order to make headway on a permissive subject of bargaining, a party must offer something valuable in return. That is what happened; ALPA paid through the nose for a change in the seniority table. United obtained favorable terms that enabled it to expand its operations--incidentally creating more positions for pilots.
 
 
 46
 Remaining contentions require only a few comments, because we generally agree with the district court's disposition of them. 765 F.Supp. at 494-97. The fleet qualified pilots contend that United violated its contracts with them when putting them behind the Group of 570. But the written contracts are conspicuously silent about seniority. United promised permanent employment at a premium salary and has lived up to these commitments. Oral statements about probable seniority rankings were predictions, not promises; the contracts state that the only promises are those written down. United told some replacements that members of the Group of 570 who did not work during the strike would never work at all. Until a district judge issued an injunction, United adhered to this position--which again was not part of the written contract.
 
 
 47
 Recasting the argument as a contention that ALPA wrongfully interfered with the contracts between United and the replacement pilots adds nothing. United kept its contracts. Anyway, a principal purpose of unions is to interfere with--indeed to eliminate--direct bargaining between firms and their workers. It is equally futile to charge United with "conspiring" with ALPA to violate its duty of fair representation. There was no violation. Employers are free to prefer one group of employees over another; the fleet qualified pilots, as recipients of a hefty preference, are in no position to protest that offsetting benefits have been ceded to another group. And it is preposterous to depict United as hostile to the fleet qualified pilots. It wanted to save money and reduce strife among its pilots, recognizing that doing so weakened management's hand in any future conflict.
 
 
 48
 The judgment of the district court in the Ozark-TWA dispute is affirmed. The judgment of the district court in the United case is reversed to the extent it enjoins implementation of the seniority provisions of the 1991 collective bargaining agreement. The remainder of the judgment is affirmed.