**Kevin GRIFFIN, Dennis Holmbeck, Roger Myers, et al., Plaintiffs–Appellants,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Defendant–Appellee.**

**No. 93–3336.**

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1994.

Decided Aug. 10, 1994.

Randall L. Mitchell (argued), James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL, for plaintiffs-appellants.

Irving M. Friedman, Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, IL, Gary Green, Elizabeth Ginsburg (argued), Air Line Pilots Ass'n, Washington, DC, for defendant-appellee.

Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

Simmons Air Lines, Inc. demoted the plaintiffs from captains to first officers. The Air Line Pilots Association did not intervene to try to save their jobs. In fact, the union actually suggested the demotion as an acceptable way for the company to deal with a shortage of first officers. The demoted pilots sued the union, claiming that it violated its duty of fair representation, and tortiously interfered with their employment expectations. The district court granted summary judgment for the union, and we affirm.

## I. Facts

Simmons, a Chicago-based regional airline, employs two categories of pilots: captains and first officers. Each plane has a crew consisting of one captain and one first officer. The captain is in charge of the crew and is better paid than the first officer. Simmons hires pilots as first officers; as vacancies for captain positions become available, first officers bid for the jobs. The bidder with the most seniority receives the captaincy. All Simmons pilots are represented in collective bargaining by the Air Line Pilots Association (the union), which is certified under the Railway Labor Act, 45 U.S.C. §§ 151–188.

The plaintiffs joined Simmons in 1989 as first officers. Later that year, several vacancies developed in captain positions. For various reasons, first officers senior to the plaintiffs decided not to bid on those positions. The plaintiffs bid; even though they had been with the company for a relatively short time, as the only bidders they got the jobs. They became the most junior captains, and as a consequence were assigned the least desirable hours and flights. They were designated "Reserve Captains" which means they had no set schedule and had to fill in on flights as needed. They willingly suffered this inconvenience, however, in expectation that eventually, as they increased in seniority, it would pay off.

In February 1992, Simmons notified the union that it had a temporary staffing imbalance: too many captains and not enough first officers. Simmons wanted the union to agree to a 90–day window where the most junior captains—including the plaintiffs—would be assigned into first officer positions, with captain's pay. The union agreed to this temporary displacement. At the time, the union and Simmons were in the process of hammering out the final details of a new collective bargaining agreement, which was to go into effect the next September. Simmons sought a contractual vehicle to deal with temporary staffing imbalances in the future. It got the union to agree to a provision in the new collective bargaining agreement which explicitly allowed the company to temporarily shift junior captains into first officer positions.

The 90–day window for temporary displacement of junior captains into first officer positions expired in June 1992. Simmons wanted to extend the window until September, when the new collective bargaining agreement was to go into effect. But the union was having trouble with the rank and file. Some first officers resented that the junior captains, who had gained their positions by default, were flying as first officers but receiving captain's pay. Some also had come to regret their decision not to apply for the captain positions back in 1989, when the plaintiffs had successfully bid. The opportunities for captaincy had dried up since then, and many first officers wished they had applied when the jobs were available.

The union, responding to these sentiments, did not immediately jump at the company's offer to extend the 90–day window. Instead, the union sent the company a list of acceptable alternatives to deal with the temporary staffing problem, including: 1) temporarily staffing the first officer positions with pilots from other regional carriers related to Sim-

mons; 2) hiring new pilots through normal channels; 3) temporarily displacing junior pilots as proposed, but giving extra pay to all first officers senior to the pilots; and 4) permanently displacing the junior captains into first officer positions. In response, the company withdrew its offer to extend the 90–day window for temporary displacement, and permanently demoted the junior captains into first officer positions, as the union had proposed in its fourth alternative.

Needless to say, the junior captains were upset. They felt sold out by the union. They thought they were singled out for bad treatment because a disproportionate number of them were not union members. Whereas about 85–90% of all Simmons pilots were union members, only 75% of the junior pilots belonged to the union at the time of their displacement (plaintiff Roger Myers resigned soon after in protest). Not only did the union fail to intervene to save their captaincies, but it appeared that the union actually encouraged the company to permanently displace them. From the plaintiffs' perspective, the union behaved in this manner so that their desirable jobs could be taken by more loyal members of the rank and file.

The plaintiffs filed suit,[1] making two claims. First, they alleged that the union's actions and inactions violated its duty of fair representation. Second, they alleged that the union tortiously interfered with their expectation of continued employment. The district court granted summary judgment for the union, determining that it did not breach its duty of fair representation, and that the state law tortious interference claim was preempted by the Railway Labor Act. The plaintiffs have appealed.

## II. Analysis

We review *de novo* the district court's grant of summary judgment. *Hamil-*

*ton v. Komatsu Dresser Indus.*, 964 F.2d 600, 603 (7th Cir.1992). Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, we must view the evidence in the light most favorable to the non-moving party, in this case the plaintiffs. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

The undisputed facts taken in the light most favorable to the plaintiffs show the union doing two things which the junior pilots found objectionable. First, the union failed to accept Simmons' offer in June 1992 to extend the window for temporary displacement a couple of months until the new collective bargaining agreement which authorized the shift was ratified. Had the union accepted this offer, presumably the plaintiffs would not be in court; they would have simply continued as junior captains, albeit temporarily displaced into first officer positions, and there would not have been a dispute. But the union did not accept the offer. Instead, it wrote a letter to Simmons, which at least suggested that the company might permanently displace the junior captains into first officer positions. That suggestion was the second thing the plaintiffs found objectionable. Our task is to determine whether the union's failure to accept Simmons' June 1992 offer, and its subsequent letter suggesting permanent displacement as a possible alternative, violated the union's duty of fair representation. Also, we must determine whether the plaintiffs possibly can succeed on their state law tortious interference claim.

---

1. Plaintiffs Myers and Rodriguez also filed a grievance against the company, claiming that Simmons violated the collective bargaining agreement by demoting the junior captains instead of hiring new first officers. The union did not support the pilots in this grievance. In order to prevail in the grievance, the pilots had to demonstrate that Simmons somehow violated the collective bargaining agreement by permanently displacing them into the first officer positions, instead of just hiring new first officers. The company prevailed; the body reviewing the grievance found that the company in no way violated the collective bargaining agreement. In their appellate brief, the pilots do not dispute that the collective bargaining agreement permitted the company to demote captains into first officer positions. *See* Appellants Brief at 4.

## A. *Duty of Fair Representation*

 A union violates its duty of fair representation to the employees it represents only if its actions are "arbitrary, discriminatory, or in bad faith...." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). This is a tripartite standard; a court should look to each element when determining whether a union violated its duty. *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 77, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991). Therefore, "[t]he three separate levels of inquiry under this standard are as follows: (1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith." *Ooley v. Schwitzer Div., Household Mfg. Inc.,* 961 F.2d 1293, 1302 (7th Cir.1992). In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to record evidence supporting any one or all of these elements. Rule 56(e), Fed.R.Civ.P.; *see also Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

 Our first inquiry, then, is whether the pilots introduced substantial evidence that the union acted arbitrarily in not accepting Simmons' June proposal, and in suggesting permanent displacement as an alternative. The Supreme Court instructs that the arbitrary prong of the fair representation test is very deferential. *O'Neill,* 499 U.S. at 76–79, 111 S.Ct. at 1135–36. It is not the court's role to second-guess tactical decisions made by employees' duly appointed bargaining representative. We only begin to inquire into such decisions when there is evidence that they are "so far outside a wide range of reasonableness, that the actions rise to the level of irrational and arbitrary conduct." *Ooley,* 961 F.2d at 1302, quoting *O'Neill,* 499 U.S. at 78, 111 S.Ct. at 1136 (citations omitted).

 At the time the union made its decision to suggest permanent displacement for the young pilots, the union faced dissension in the ranks. Many dues-paying first officers senior to the plaintiffs (some of whom were not union members) resented having to play second fiddle—in pay and in status—to the young captains. They wanted a second chance to bid for the positions. At least they wanted the same lucrative pay the young captains received when they acted as first officers. To accommodate these senior pilots, the union allowed—even encouraged—Simmons to permanently displace the young captains. The parties do not dispute that Simmons had the unfettered right under the collective bargaining agreement to demote the captains (*see* footnote 1). In the end, the union just did not interfere as Simmons exercised this prerogative. This cured the union's problems with its senior first officers, who now would be able to bid on the plaintiffs' jobs.

This chain reaction, which the union set in motion and did nothing to stop, surely was not in the plaintiffs' interest. After three years of pulling the toughest duty as captains, they were sent unceremoniously back into the lower ranks of first officers. The union essentially allowed the few to be sacrificed to appease the many. Can we say that it acted irrationally and arbitrarily in doing so? As with any organization that must decide an issue of controversy, we must assume that many union actions satisfy a majority of its members to the chagrin of the few. This concept might blur the best vision of a union, but it does not violate federal labor laws. *See* discussion in *Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524, 1529–37 (7th Cir. 1992). In short, the union did not act arbitrarily by failing to support the plaintiffs as the company exercised its rights under the collective bargaining agreement to permanently demote them.

 The plaintiffs support the discriminatory and bad faith prongs of their fair representation claim by arguing that the union unfairly singled them out for mistreatment because a disproportionate number of them were not union members. They cite two facts to make this argument. First, that while 10–15% of Simmons' pilots as a whole did not belong to the union, 25% (two of eight) of the junior captains affected by the permanent displacement were not union members. Second, they cite comments allegedly made by high-ranking union officials, showing disdain for Simmons' pilots who failed to join the union.

But no reasonable juror could have relied on these facts to conclude that the union acted discriminatorily or in bad faith. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. ("There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."). The statistical variance—10–15% versus 25%—is not significant enough to imply that the union sacrificed the plaintiffs because of some impermissible animus for the two who were not union members. If anything, this statistic works the other way: if the union was willing to sacrifice six of its members, it was not likely acting on some animus toward employees who did not belong to the union. And the fact that discovery in this case has uncovered alleged statements by highly-placed union officials expressing distaste for pilots who did not join the union should surprise nobody. Likely, in any union the true believers resent the lukewarm. This sentiment cannot support the inference that the union leaders targeted the pilots who were not union members, especially when the shrapnel from the alleged attack also impacted a disproportionate number of union members.

In sum, there is no possible inference that the plaintiffs were unfairly singled out, which is the gist of their entire claim. The union simply allowed their interest to be overridden to advance the will of the majority: it is the nature of any union that the majority can prevail against the minority. This may be distasteful, especially as here, where the minority has a sympathetic position. But it cannot be described as arbitrary, discriminatory or in bad faith. If it could, virtually every union decision—which, assuming dissent, always entails the majority's success against a minority—could be construed as a breach of duty of fair representation claim.

2. Common sense also dictates that the scope of the Railway Labor Act's preemption extends at least as far as the plaintiffs' case. If it did not, every union member adversely affected by union action or inaction concerning his job could make the same state law claim. This would severely

*See generally Rakestraw*, 981 F.2d at 1529–37.

## B. Tortious Interference

 Having decided the federal claim, there is considerable question whether we should even exercise our jurisdiction over the pendent state claim; at this point, it is appended to nothing, since we have determined the federal claim is not viable. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *see also* 28 U.S.C. § 1367. But, as the district court determined, the state claim is easily resolved—it is preempted by the Railway Labor Act. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994) ("judicial economy, convenience, fairness and comity may point to federal retention of state-law claims ... when it is absolutely clear how the pendent claims can be decided.").

 In their tortious interference claim, the plaintiffs alleged, essentially, that they had an expectation of a continuing valid business relationship with Simmons, and that the union interfered with that expectation. Illinois permits lawsuits based on tortious interference with a prospective economic advantage in an employment relationship. *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 656, 568 N.E.2d 870, 877 (1991). If we were to apply that law in this case, we would have to investigate the nature of the business relationship between the pilots and Simmons to assess the degree of expectation. This would require interpretation of the applicable collective bargaining agreement. But the Railway Labor Act preempts state law claims which turn on interpretation of collective bargaining agreements. *Andrews v. Louisville and Nashville R. Co.*, 406 U.S. 320, 324, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972); *Underwood v. Venango River Corp.*, 995 F.2d 677, 682 (7th Cir. 1993). Therefore, the district court was correct to dismiss the tortious interference claim, because it was preempted.[2]

impinge on the network for dispute resolution set up under the Act. It would provide recourse and remedy for labor disputes outside the structure for resolving such disputes authorized by the Act. *See Peterson v. Air Line Pilots Ass'n Int'l*, 759 F.2d 1161, 1170–71 (4th Cir.1985). A purpose of

### III. Conclusion

For the foregoing reasons, we AFFIRM.

the Act is to prevent such parallel and distinct methods of dispute resolution. 45 U.S.C. § 151(a). This is an additional reason that the state claim must be preempted by the Act.